RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0010p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

COURTNEY ADAMS, Mother and Next Friend of Minors K.E. and V.E.; KIM HUSKEY, Mother of Decedent and Personal Representative on behalf of Estate of Anthony Edwards,

> *Plaintiffs-Appellees*,

> *v.*

BLOUNT COUNTY, TENNESSEE,

> *Defendant*,

JERRY BURNS, In his Individual and Official Capacity,

> *Defendant-Appellant*.

No. 19-5306

---

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 3:17-cv-00313—Pamela Lynn Reeves, Chief District Judge.

Argued: December 3, 2019

Decided and Filed: January 8, 2020

Before: GRIFFIN, STRANCH, and DONALD, Circuit Judges.

---

## COUNSEL

**ARGUED:** Gary M. Prince, O'NEIL, PARKER & WILLIAMSON, PLLC, Knoxville, Tennessee, for Appellant. Troy L. Bowlin II, THE BOWLIN LAW FIRM P.C., Knoxville, Tennessee, for Appellee. **ON BRIEF:** Gary M. Prince, N. Craig Strand, O'NEIL, PARKER & WILLIAMSON, PLLC, Knoxville, Tennessee, for Appellant. Troy L. Bowlin II, THE BOWLIN LAW FIRM P.C., Knoxville, Tennessee, for Appellee.

———————————

**OPINION**

———————————

JANE B. STRANCH, Circuit Judge.   This case began with a report of suspicious individuals walking down a rural road in Tennessee in the early morning hours of July 25, 2016. It ended with an encounter between Anthony Edwards and two Deputies, Jerry Burns and James Patty, that resulted in Edwards's death.  Edwards's fiancée and his mother sued on behalf of his estate for violations of the U.S. Constitution and Tennessee state law, including a Fourth Amendment claim for excessive force.  The motion of the Deputies for qualified immunity on the excessive force claim was denied and is the basis for this interlocutory appeal.  Because the appeal is premised on factual disputes and not questions of law, we must **DISMISS** the case for lack of jurisdiction.

## I.  BACKGROUND

### A.  The Initial Call

Late in the evening on July 24, 2019, Blount County sheriff's department held a mandatory briefing that included Defendant Deputy Burns regarding suspect Dylan Tarbett, wanted for assaulting an officer.  Tarbett was last known to be staying at Winchester Drive, but it was unclear whether he was still there.  He allegedly possessed a .45 caliber handgun and had threatened to kill any officer who made contact with him.  Burns was patrolling "Zone 4" that evening, which included Winchester Drive.

Patrol officers received a radio call describing three suspicious individuals walking near Winchester Drive.  Burns responded to the call and, concerned that one of the suspicious individuals might be Dylan Tarbett, drove around the area until he saw two men walking toward him on the road.  As he drove past the two men, Burns says that he noticed one of them acting "fidgety" and trying to hide his face with his hands.  Turning on his body camera, Burns exited his car and asked the men their names and date of birth.  Travis Hickman provided his information and Edwards identified himself as "Joe Eldridge" and his date of birth as "7/87/85."

Edwards snickered as he provided this information, which aroused Burns's suspicion. Burns ordered Edwards to stand "right there" and put his hands behind his head.

Burns patted down Edwards, and "as soon as [Burns's] hand hit his pocket, [Edwards] took off." A chase ensued, until Edwards fell and Burns caught up and tried to hold him. Burns ordered Edwards to put his hands behind his back, and Edwards responded, "I'm trying"; the two struggled and yelled with Burns repeatedly shouting, "roll over," and Edwards responding, "I'm trying." After several minutes, Edwards said he was having a seizure and complained of injuries. Deputy Michael Bennett then arrived as backup, ran toward the two yelling commands and, according to his deposition, said it looked like Edwards was giving Burns "a piggy back ride." His body camera revealed that Edwards said, "I'm not running, I'm not, he's [expletive] hitting me." Bennett then went to find Travis Hickman.

Deputy Patty arrived around the same time and after Bennett left, heard Edwards say "I had a [expletive] seizure, and you go and just [expletive] hit me in the face. It's [expletive] up. Why are you doing this to me?" Burns told Patty that "every time I get up, he runs." Burns handcuffed Edwards with his hands in front of him. Edwards asked Burns to call 911 to which Burns threatened him with a taser, saying "You see this? This is a taser. You do anything I tell you not to do or don't do something I tell you, you're gonna get lit up, you understand?" Burns again said that "every time I get up, he runs" and Edwards responded, "I try to stand up because I feel like I'm going to pass the [expletive] out." At that point, Burns's camera fell off his body.

**B. The Use of Force**

Five people were present during the use of force: Edwards, Deputies Burns and Patty, Edwards's friend Hickman, and passerby Lauren Hatcher, a neighborhood resident. Though Bennett was on the scene, he testified that he did not witness this part of the altercation. Because there is no video footage, the testimonies of these individuals serve as the primary evidence of when and how Burns used force that resulted in Edwards's death.

Deputies Burns and Patty escorted Edwards in handcuffs to Patty's SUV. According to Burns, he and Patty both kept Edwards in their grasp on their way to the car, but Patty testified that after the initial encounter he never laid a hand on Edwards the entire night. While they

provided different facts about their walk to the car, the officers appear to agree that Edwards got away and began running.  Burns caught up to Edwards and grabbed him around the waist, his feet lifted off the ground kicking.  Deputy Patty had his taser out and ready to deploy when Edwards kicked Patty near or in the groin.

Burns testified that he "felt a momentum going backward" and he and Edwards hit the ground, though he does not know exactly how that happened.  Deputy Patty described the "fall" as Burns "pushing Edwards slightly down and out."  Despite being pushed forward, Patty said that Edwards landed on his back.  Later, when Burns spoke to Deputy Bennett about the incident, he said:  "I didn't think he'd take off running again when me and Patty had him—got him out to the back of this vehicle."  He further explained, "I went to pick him up and pull him back and like he, he fell.  He fell right on his back."

Lauren Hatcher witnessed the altercation while walking her dog.  In her earlier sworn declaration, Hatcher asserted she saw "two gentlemen fighting in the middle of the road[.]"  She saw Edwards "hit and kick" the police officer, and when the officer tried to hold him, Edwards "darted away."  She did not see an officer hit or strike Edwards.  From her perspective nothing "intentional" was done against Edwards, and the officer "was just trying to get the gentleman under control and the gentleman would not cooperate."  Further, Hatcher described the incident leading to Edwards's injuries as follows:

> It appeared the police officer and the gentleman got their feet tangled up and they fell to the ground.  There was no force involved.  It just looked like two people tripping and they just fell over.  From what I saw the officer did not toss him to the ground.  I did not see the gentleman's feet fly up in the air and it just seemed like they both fell down.

In her August 31, 2018 deposition, Hatcher testified that Edwards kicked Deputy Patty when he opened the door to the SUV, not afterwards when Edwards supposedly ran away from the officers and Burns caught him, as Burns and Patty stated.  Notably, Hatcher did not actually see Edwards kick Patty but inferred that it happened right before Burns and Edwards fell to the ground:

> I seen his thigh come up—I mean, it's an automatic reaction, if you're going— when [Burns] had him kind of—you know, when he had him by the shoulders,

was fixing to put him in the cop car, you seen Edwards's leg come up.  I mean, you seen his thigh from the back of the car.  You seen him push back.  You seen the way that his back come back.

At this point, Hatcher states that Edwards's and Burns's feet "got tangled" and that is how they fell, mentioning that it looked like Burns was trying to save him and Edwards from falling or getting injured.

Edwards's companion, Hickman, remained at the scene after Edwards was taken to the hospital, but he did not see the final altercation.  He provided two sworn declarations, the first signed on February 23, 2018, and the second on August 23, 2018.  In the first, Hickman said Burns and Edwards "wrestled around" before Edwards ran away and was then caught again.  He stated that "Edwards was not doing what he was told to do."  In the second, Hickman asserted that Edwards was "begging for his life, begging the officer to stop hitting him."  Hickman ran toward them to see what was happening, and he saw "Burns standing over [Edwards], hitting him with both fists."  When the other officers arrived, Edwards was in handcuffs and "doing what he was told to do."  The officers then took Edwards to the SUV and, when Hickman heard (but did not see) the "scuffle," he ran over and saw Edwards on the ground "clearly unconscious."

Hickman was in Sevier County jail when Blount County investigator Tim Hutchison asked for his (first) declaration; the reason for his incarceration is unclear.  According to Hickman, Hutchinson offered to "get [him] out of there" in exchange for providing the declaration.  Because Hickman could not read, the declaration was read to him before he signed; however, Hickman alleges that the recorded declaration does not match what he remembers telling Hutchison, what he remembers of the night of the incident, or what he remembers Hutchison reading back to him for his approval before signing the statement.  After he gave his statement to Hutchinson, he was released soon thereafter and the charges against him were dropped.

**C.  The Investigation**

Soon after the altercation, then Sergeant Scott Boyd arrived at the scene and saw Edwards handcuffed and lying on the ground with blood coming out of his ears.  He called for

medical assistance and then spoke with Deputy Burns, who recounted that Edwards was fighting them and kicked Deputy Patty in the groin. Burns told Boyd that he "pulled [Edwards] back" and "dropped him." Boyd then spoke with Patty, who said Burns "slammed" Edwards. Boyd returned to Burns and asked whether he "slammed" Edwards, and Burns clarified that "it was more of a slam."

When Detective Douglas Davis arrived on the scene, he spoke with Sergeant Boyd and Travis Hickman, and assisted with taking measurements and photographs of the scene. Davis then went to the hospital where Dr. Popsiech, Edwards's treating physician, said that Edwards would not survive his injuries because his "skull was fractured in the rear near the spinal cord" and he suffered "severe brain injury" from one event of trauma to the back of the head. Dr. Popsiech was informed that Edwards had fallen backward but said that his injuries were inconsistent with such a report unless "he had been on a ladder or fence."

Davis was also present at Edwards's autopsy. Dr. Amy Hawes, a Knox County Assistant Medical Examiner, prepared the final autopsy report and submitted a sworn affidavit summarizing her findings. She found multiple contusions around Edwards's head, chest, back, and abdomen, and two "linear, full-thickness fractures" to the occipital bone at the base of the skull. Additionally, she found "blunt force injuries of the head that are consistent with an accelerated fall on the back of the head." Dr. Hawes defined accelerated fall as a fall where the "force applied . . . is greater than or in addition to the force of gravity that causes you to hit the ground." Dr. Hawes ultimately determined that blunt force injuries to the head caused Edwards's death, and categorized the manner of death as a homicide.[1]

Finally, on July 28, 2016, Deputy Chief Tom Spangler initiated an administrative review of the general order for "Use of Force" and concluded that there were no violations. Spangler determined that "[w]hile Deputy Burns did take Edwards to the ground, it was not a takedown

---

[1]Burns disputes the source of some of Edwards's injuries. On July 24, 2019, Plaintiff Courtney Adams was driving Edwards to drop him off near Jacob Road. During that drive, they had a "minor disagreement," which Edwards wanted to talk about further. Adams testified that she needed to leave and, in an attempt to get her to stay, Edwards jumped across the hood of her car. While Hickman initially stated that Edwards told him Adams had "run him over," he later asserted that Edwards mentioned only that Adams "bumped" into him. This evidence, however, does not directly contradict Dr. Hawes's conclusions.

that would lead a reasonable person to believe it would cause serious bodily injury." He recommended exoneration for Burns and that "no further actions be taken."

### D. Procedural History

Plaintiffs Courtney Adams, Edwards's fiancée and the mother of his two children, and Kim Huskey, the Personal Representative of Edwards's estate, filed suit on July 24, 2017, alleging violations of the U.S. Constitution and of Tennessee state law. Deputies Burns and Patty, in their individual capacities, moved for summary judgment in part based on qualified immunity. The district court thoroughly examined the parties' arguments and dismissed several of Plaintiffs' claims. It denied qualified immunity on Plaintiffs' excessive force claim, finding the existence of a genuine dispute of material fact regarding whether Burns's use of force was excessive under the Fourth Amendment's reasonableness standard and violated Edwards's clearly established rights. Defendant Burns filed this interlocutory appeal to address qualified immunity on the excessive force claim.

## II. ANALYSIS

We review the district court's grant of summary judgment on qualified immunity grounds *de novo*. *Simmonds v. Genesee Cty.*, 682 F.3d 438, 444 (6th Cir. 2012). To prevail on their § 1983 claim, Plaintiffs "must establish that a person acting under color of state law deprived [Edwards] of a right secured by the Constitution or laws of the United States." *Smoak v. Hall*, 460 F.3d 768, 777 (6th Cir. 2006) (quoting *Waters v. City of Morristown*, 242 F.3d 353, 358–59 (6th Cir. 2001)). Here, Plaintiffs assert that Burns violated Edwards's Fourth Amendment rights by using excessive force when he arrested him, resulting in his death.

Defendant Burns asserts "the defense of qualified immunity, which shields government officials from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Thus, Plaintiffs carry the burden of proving that Burns is not entitled to qualified immunity. *See v. City of Elyria*, 502 F.3d 484, 491 (6th Cir. 2007). In determining whether law enforcement is shielded from civil liability due to qualified immunity, the court must determine: (1) whether, when viewing the facts in the light

most favorable to Plaintiffs, Burns violated Edwards's rights; and (2) whether those rights were clearly established at the time of the alleged violation. *See Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 786 (6th Cir. 2012); *see also Saucier v. Katz*, 333 U.S. 194, 201 (2001). "These questions may be answered in either order[.]" *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015).

We must first determine whether we have jurisdiction. We are authorized to hear appeals only from "final decisions" of the district court. 28 U.S.C. § 1291. "[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 . . . ." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). But the final judgment rule is deeply rooted in American law, and this exception is a narrow one. *Barry v. O'Grady*, 895 F.3d 440, 443 (6th Cir. 2018). We have jurisdiction only to the extent that the defendant "limit[s] his argument to questions of law premised on facts taken in the light most favorable to the plaintiff." *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 538 (6th Cir. 2008); *see also McGrew v. Duncan*, 937 F.3d 664, 669 (6th Cir. 2019) ("[W]e may examine only purely legal questions."). In other words, a defendant may not appeal a denial of a motion for summary judgment based on qualified immunity "insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 320 (1995).

There are two narrow circumstances in which an interlocutory appeal record may contain some dispute of fact. First, we may overlook a factual disagreement if a defendant, despite disputing a plaintiff's version of the story, is "willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal." *Barry*, 895 F.3d at 443 (quoting *Phelps v. Coy*, 286 F.3d 295, 298 (6th Cir. 2002)). And second, in exceptional circumstances, we may decide an appeal challenging the district court's factual determination if that determination is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (relying on video footage in the record that captured the incident in question because it "utterly discredited" the plaintiff's version of events); *see also Ayala v. Hogsten*, 786 F. App'x 590, 591 ("We take the facts in the light most favorable to [the plaintiff] unless they are clearly contradicted by video.").

In determining the scope of our jurisdiction, we "separate an appellant's reviewable challenges from its unreviewable." *Diluzio v. Vill. of Yorkville, Ohio*, 796 F.3d 604, 610 (6th Cir. 2015). We may still review "pure question[s] of law, despite the defendants' failure to concede the plaintiff's version of the facts[.]" *Livermore ex el Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007). In doing so, we "ignore the defendant's attempts to dispute the facts and nonetheless resolve the legal issue, obviating the need to dismiss the entire appeal for lack of jurisdiction." *Diluzio*, 796 F.3d at 611 (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005)). We therefore defer to the district court's determinations of fact. *Barry*, 895 F.3d at 443. And beyond those determinations, "a defendant may not challenge the inferences that the district court draws from those facts, as that too is a prohibited fact-based appeal." *Id.* (quoting *Diluzio*, 796 F.3d at 609). As a result, we "need look no further than the district court's opinion," and "we often may be able merely to adopt the district court's recitation of facts and inferences." *Id.* (quoting *Diluzio*, 796 F.3d at 611). We find the district court's opinion is this case to be well-reasoned and supported by the record, and therefore only briefly address the various arguments raised by Burns.

As the district court correctly found, Burns fails to limit his arguments to questions of law taking the facts in the light most favorable to Plaintiffs. Burns first argues that he should not be required to show that Edwards posed an immediate threat of serious harm because he did not use "deadly force." In excessive force cases, the threat factor is "'a *minimum* requirement for the use of deadly force,' meaning deadly force 'may be used only if the officer has probable cause to believe that the suspect poses a threat of severe physical harm.'" *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015) (quoting *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005)). And in cases where the witness most likely to contradict the officer's testimony is dead, "the court may not simply accept what may be a self-serving account by the police officer. It must look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story." *Jefferson v. Lewis*, 594 F.3d 454, 462 (6th Cir. 2010) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).

Here, there is more than circumstantial evidence potentially discrediting Deputy Burns's story. The district court dispensed with Defendant Burns's factual assertion of the force he

employed, emphasizing that the final autopsy report found that Edwards suffered injuries during an altercation and that his death was caused by "blunt force injuries to the head," which is "consistent with an accelerated fall on the back of the head." Burns merely offered an alternative explanation: that Edwards's death could have been caused by Adams previously hitting Edwards with her car, thus disputing the autopsy report's conclusions. Whether Burns used deadly force is a "mixed question of law and fact." *Howser v. Anderson*, 150 F. App'x 533, 539 (6th Cir. 2005) (citing *Robinette v. Barnes*, 854 F.2d 909, 912 (6th Cir. 1988)). The underlying factual circumstances leading to Edwards's injuries and the degree of force used are in dispute. The district court's reliance on the autopsy report was appropriate at the summary judgment stage. Burns's contention is thus a prohibited fact-based challenge.

In his initial brief, Burns disputes the following additional facts: (1) his belief that Edwards was Dylan Tarbett; (2) that there was a "struggle" in the field; and (3) the way he took Edwards to the ground. But these too are the types of prohibited fact-based challenges that go to the heart of the legal issue: whether Burns's conduct rises to excessive force in violation of the Fourth Amendment. *See Harmon v. Hamilton Cty.*, 675 F. App'x 532, 541 (6th Cir. 2017) (citing *DiLuzio*, 796 F.3d at 611–12) (additional citation omitted).

Burns also argues that the following factual determinations are blatantly and demonstrably false: (1) whether Edwards fled a second time before Burns used force; and (2) whether Edwards assaulted Deputy Patty. Burns contends that the record establishes that Edwards fled a second time. The district court reasoned:

> It is clear from the record that Mr. Edwards had previously tried to evade arrest. But the fact that Mr. Edwards previously attempted to escape does not necessarily mean it was objectively reasonable for Deputy Burns to think Mr. Edwards was trying to escape when the "slam" or "fall" took place. There is, of course, no video of this incident, so the most reliable testimony comes from the depositions. Both officers testified they were walking back to Deputy Patty's car with Mr. Edwards in handcuffs. The officers do not agree on who had hold of Mr. Edwards, but they both say Mr. Edwards ran away from the car, and that Deputy Burns caught up with him grabbing Mr. Edwards around the waist.
>
> But this testimony is contradicted by Ms. Hatcher, the witness at the scene. In her telling, Mr. Edwards kicked at Officer Patty when he was opening the door. Under this account, Mr. Edwards never tried to escape a second time. And, according to the officers' own testimony, Mr. Edwards had on handcuffs, which a

jury could infer impeded Mr. Edwards's ability to escape or resist arrest, especially with three officers present on the scene. Viewing the facts in the light most favorable to the plaintiffs, a finder of fact could reasonably conclude that Mr. Edwards might not have been resisting arrest at all, and that even if he were resisting, it was highly unlikely he would actually escape.

*Adams as Next Friend of K.E. v. Blount Cty., Tenn.*, No. 3:17-CV-313, 2019 WL 1233750, at *18 (E.D. Tenn. Mar. 15, 2019) (citations and footnote omitted).

Burns argues that Hatcher's testimony is not contradictory, but rather consistent with, the officers' testimony because she stated in her declaration that "when more police officers arrived . . . they walked Edwards to the police car and he tried to run again." Again, Burns is attempting to dispute the district court's factual determinations rather than argue a question of law. Between her two sworn declarations, Hatcher presents two versions of the events leading up to Burns's use of force: one in which she witnessed Edwards "dart[] away" before falling to the ground and one in which Edwards and Burns fell to the ground due to the force of Edwards's kick to Deputy Patty's body. These credibility concerns, as the district court explained, establish that the record reasonably supports a finding that Edwards was not attempting to flee.

As for whether Edwards assaulted Deputy Patty, the district court determined that viewing the facts in Plaintiffs' favor, "a 'severe' threat did not exist when a handcuffed, unarmed suspect attempted to kick an officer twice his size, while he was in the clutches of another officer who weighed about eighty pounds more." *Adams as Next Friend of K.E.*, 2019 WL 1233750, at *18. While Deputies Burns and Patty testified that Edwards kicked Patty, there is no video capturing that incident; Burns did not mention any such assault in the first three times he recounted what occurred; and Hatcher, the only other eye witness present, never testified that she saw Edwards actually kick Patty despite inferring as much.

The foregoing arguments all involve factual disputes that deprive this court of jurisdiction. And Burns has failed to show that any of these disputes rely on facts that are blatantly contradicted by the record. *Scott*, 550 U.S. at 380.

Burns also argues that he did not violate any "clearly established" constitutional right, which typically constitutes a legal argument for purposes of jurisdiction. *See Estate of Carter*,

408 F.3d at 310 (explaining that "aside from [any] impermissible arguments regarding disputes of fact, [a] defendant [appealing a qualified immunity denial] also raises 'the purely legal question of whether the facts alleged . . . support a claim of violation of clearly established law,' then there is an issue over which this court has jurisdiction" (citation omitted) (quoting *Berryman v. Rieger*, 150 F.3d 561, 562 (6th Cir. 1998))).

When raising his legal argument, however, Burns fails to concede the most favorable view of the facts to Plaintiffs and instead relies solely on his version of the facts, as addressed above. In *Phelps v. Coy*, we explained that we have jurisdiction to disregard defendants' attempts to dispute plaintiffs' facts only in cases where "the legal issues are discrete from the factual disputes." 286 F.3d at 298. Similarly, in *Beard v. Whitmore Lake School District*, we held that interlocutory jurisdiction over appeals from denials of qualified immunity involving disputed facts only exists where "some minor factual issues are in dispute" and "it does not appear that the resolution of [such] factual issues is needed to resolve the legal issue" also presented. 402 F.3d 598, 602 n.5 (6th Cir. 2005); *see also Claybrook v. Birchwell*, 274 F.3d 1098, 1103 (6th Cir. 2001). In such circumstances, we must "separate an appealed order's reviewable determination (that a given set of facts violates clearly established law) from its unreviewable determination (that an issue of fact is 'genuine')." *Roberson v. Torres*, 770 F.3d 398, 402 (6th Cir. 2014) (quoting *Johnson*, 515 U.S. at 319). If, however, disputed factual issues are "crucial to" a defendant's interlocutory qualified immunity appeal, we may not simply ignore such disputes; we remain "obliged to dismiss [the appeal] for lack of jurisdiction." *Phelps*, 286 F.3d at 298; *see also McKenna v. City of Royal Oak*, 469 F.3d 559, 561 (6th Cir. 2006).

The facts Burns disputes are "crucial to" his qualified immunity appeal. Burns continues to insist on appeal that he did not use deadly force, to define his "slam" as an action in which he "pushed" Edwards's body "out" and "down" while they both were falling, and to argue that Edwards had fled when he attempted to place him in the SUV. The district court found that these issues are genuinely disputed and material to determining whether Burns exercised excessive force. As explained above, there is enough record evidence demonstrating that these findings of fact and inferences are not blatantly and demonstrably false. Moreover, these factual disputes are neither "minor[,]" *Beard*, 402 F.3d at 602 n.5, nor "immaterial to the legal issues

raised by the appeal," *Claybrook*, 274 F.3d at 1103. Rather, they serve as the basis for Burns's legal argument that he did not use excessive force and that his actions were objectively reasonable. *See Hopper v. Phil Plummer*, 887 F.3d 744, 758–59 (6th Cir. 2018) (holding that the court lacked jurisdiction over the defendants' claim that a right to medical care was not clearly established because the underlying "medical-personnel argument is fact-bound").

Because genuine issues of material fact regarding Defendant Burns's qualified immunity claim exist, and because the arguments raised by Burns concerning the denial of qualified immunity rely on disputed facts, this court is without jurisdiction and the case must be dismissed.

### III. CONCLUSION

For the foregoing reasons, we **DISMISS** this case for lack of jurisdiction.