NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0532n.06

**No. 19-1592**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| ESTATE OF KEVIN MATTHEWS, deceased, by KIM MATTHEWS, Personal Representative, | ) ) ) | **FILED** Sep 14, 2020 DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| CITY OF DEARBORN, MICHIGAN, | ) ) | COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| Defendant, | ) ) | |
| CHRIS HAMPTON, Police Officer, | ) ) | OPINION |
| Defendant-Appellee. | ) ) ) | |

**BEFORE:** STRANCH, READLER, and MURPHY, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** This Fourth Amendment claim for excessive force arises from the fatal shooting of Kevin Matthews by Dearborn Police Officer Chris Hampton. The Officer appeals the district court's denial of qualified immunity in the civil rights suit brought by Plaintiff, Matthews' estate, under 42 U.S.C. § 1983. Because this interlocutory appeal is based on factual disputes and not purely legal questions, we must **DISMISS** it for lack of jurisdiction.

## I. BACKGROUND

We begin with the factual background. Because this is an interlocutory appeal of a denial of qualified immunity, we defer to the factual determinations below; "ideally we need look no further than the district court's opinion for the facts and inferences cited expressly therein." *Dilution v. Village of Yorkville, Ohio*, 796 F.3d 604, 611 (6th Cir. 2015). We "ignore the

defendant's attempts to dispute the facts." *Adams v. Blount Cty.*, *Tennessee*, 946 F.3d 940, 948 (6th Cir. 2020) (quoting *Diluzio*, 796 F.3d at 611).[1]

On December 23, 2015, Hampton was conducting a traffic stop when he noticed Kevin Matthews walking by. *Estate of Matthews v. City of Dearborn*, No. 16-13763, 2019 WL 1897154, at *1 (E.D. Mich. Apr. 29, 2019). Hampton recognized Matthews from prior, non-violent encounters. *Id.* He knew that earlier in the day Matthews had been accused of trying to steal a can of Red Bull from a gas station and had fled from officers. *Id.* Hampton concluded the traffic stop and drove in Matthews' direction, catching up with Matthews and ordering him to stop. Matthews began to flee, and Hampton exited his police car to run after him.

Hampton explained that he chased Matthews up the driveway of a residential property and into its backyard. Matthews climbed over a chain-link fence, ripping his pants down the leg, which made it difficult for him to run. Hampton followed Matthews, jumped over the fence, and landed on top of him. While on top of Matthews, Hampton calmly used the police dispatch to call in a "code green," which meant that he believed he was safe.

Hampton is 6 feet 2 inches tall and weighs 215 pounds; Matthews was about 5 feet 9 inches and 140 pounds, and had fractured his left (dominant) arm four weeks earlier, on November 26, 2015; his soft cast was removed a week before his encounter with Hampton on December 15, 2015.

According to Hampton, Matthews struggled free and was able to grab Hampton's pepper spray from his duty belt and stand over him. Hampton claims that while he was "on his butt angled up," with Matthews standing over him, Hampton punched Matthews twice in the jaw, took the pepper spray, and threw it over the fence. Matthews broke free and attempted to run; Hampton

---

[1] There is no video evidence of the moments leading up to or the time period during which Hampton shot and killed Matthews.

grabbed Matthews' sweater and pushed him into the garage door. Hampton asserts that both men then hit the garage door and fell to the pavement and that while he was on his back, Matthews stood over him and grabbed his ammunition magazine. Hampton claims that Matthews then dropped the magazine and reached for Hampton's gun.

Hampton carried his gun in its double-locked holster on his right (dominant) side. The double-lock holster requires an officer to depress two safety mechanisms to release the gun. First, the officer presses his thumb down to release the hood; with the hood released, the gun remains locked until the officer depresses the second lock with his forefinger; only then is an officer able to pull the gun free from the holster.

Hampton's gun remained secure throughout his pursuit of Matthews and the alleged struggle at the fence. Hampton claims that when Matthews "was going after" his gun, Hampton "grabbed it and realized it was free, it was loose" in his holster. Hampton stated that he did not release the safety mechanisms but offered no explanation for how his gun became loose. According to Hampton's version of events, as they struggled for control of his firearm, he feared for his life, so when he gained control of his weapon, he fired shots at Matthews' body. Hampton testified that he was "supine" on the ground and Matthews was leaning over him, about 12 to 13 inches away when Hampton shot him in the chest. Nine bullets struck Matthews. Hampton notified dispatch that shots were fired at 12:29 p.m., one minute after he had called in the "code green." Matthews died from the multiple gunshot wounds.

Evaluating the evidence presented and making findings about what a jury could reasonably conclude, the district court denied summary judgment to Officer Hampton. *Estate of Matthews*, 2019 WL 1897154, at *1. In light of the evidence of how Hampton's double-locked holster worked, the court concluded that, "given the safety mechanisms, which were functional at the

time," it is "doubtful" that the gun was loose in Hampton's holster. *Id.* at *4 (citing video demonstration of double-locked holster in the record). The court also considered testimony from Plaintiff's experts, who concluded that the shooting could not have occurred in the manner Hampton describes.

One expert conducted a biomechanical analysis of the incident, including an analysis of the bullet trajectories through Matthews' body. Two of the three bullets that went through Matthews were found on the ground underneath his body and one was found next to his body. The expert opined that it "is highly unlikely for three bullets that pass through Kevin Matthews' body with an upwards trajectory . . . to end up next to his body." He noted that other physical evidence is inconsistent with Hampton's account that Matthews was standing over him and reaching for his gun when Hampton fired his weapon: Matthews did not fall on Hampton after the shooting and none of Matthews' blood was found on Hampton's clothing.

Another expert, a forensic firearms examiner and crime scene reconstructionist, also opined that Matthews could not have been standing over Hampton reaching for his gun as Hampton claims. He stated that the "angle of the shots and the passage of the bullets through Mr. Matthews['s] body indicate that he would have been lying on his back or left side with Officer Hampton either lying behind/on top of him on the ground or over him firing in a downward direction which would account for the two bullets recovered under Mr. Matthews and the one on the ground near the back of the victim."

Noting that it had carefully examined all the evidence in the record, the district court denied summary judgment, concluding that "[t]he opinions of these experts, based upon the physical evidence, is sufficient to cast doubt on Hampton's claim that Matthews was standing over him and trying to get his gun when the shooting occurred." *Estate of Matthews*, 2019 WL 1897154, at *5.

The court determined that there existed "a genuine issue of material fact regarding the circumstances surrounding the shooting and Officer Hampton's credibility," which made a grant of qualified immunity inappropriate. *Id.*

## II.   ANALYSIS

Because this is an interlocutory appeal based on a denial of qualified immunity, we begin by determining the scope of our jurisdiction. We are authorized to hear appeals only from "final decisions" of the district court. 28 U.S.C. § 1291. "[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 . . . ." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). But this exception is a narrow one. *Barry v. O'Grady*, 895 F.3d 440, 443 (6th Cir. 2018). We have jurisdiction only to the extent that the defendants limit their argument to purely legal questions. *McGrew v. Duncan*, 937 F.3d 664, 669 (6th Cir. 2019). Defendants may not appeal a denial of a motion for summary judgment based on qualified immunity "insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 320 (1995).

There are two narrow circumstances in which we still have jurisdiction over a denial of qualified immunity interlocutory appeal that involves disputed facts. First, we may overlook a factual disagreement if a defendant, despite disputing a plaintiff's version of the story, is "willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal." *Barry*, 895 F.3d at 443 (quoting *Phelps v. Coy*, 286 F.3d 295, 298 (6th Cir. 2002)). Second, we may decide an appeal challenging the district court's factual determination in the exceptional circumstance that the determination is "blatantly contradicted" by the record such "that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (relying on video footage in the record that captured the incident in question because it "utterly discredited" the

plaintiff's version of events); *see also Ayala v. Hogsten*, 786 F. App'x 590, 591 (6th Cir. 2019);

*Coble v. City of White House*, 634 F.3d 865, 868–69 (6th Cir. 2011).

To succeed on a § 1983 claim, Plaintiff "must establish that a person acting under color of state law deprived [Matthews] of a right secured by the Constitution or laws of the United States." *Waters v. City of Morristown*, 242 F.3d 353, 358–59 (6th Cir. 2001). Plaintiff claims Hampton violated Matthews' Fourth Amendment rights by using excessive force that caused his death. Hampton asserts the defense of qualified immunity, which shields government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Plaintiff ultimately carries the burden of proving that Hampton is not entitled to qualified immunity. *See v. City of Elyria*, 502 F.3d 484, 491 (6th Cir. 2007). In determining whether law enforcement is shielded from civil liability due to qualified immunity, the court must decide: (1) whether, when viewing the facts in the light most favorable to Plaintiff, Hampton violated Matthews' rights; and (2) whether those rights were clearly established at the time of the alleged violation. *Adams*, 946 F.3d at 948. "In excessive force cases, the threat factor is 'a *minimum* requirement for the use of deadly force,' meaning deadly force 'may be used only if the officer has probable cause to believe that the suspect poses a threat of severe physical harm.'" *Id.* at 949 (quoting *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015)).

The district court determined that a genuine issue of material fact about the shooting event and Officer Hampton's credibility exists regarding whether Hampton had probable cause to believe that Matthews posed a threat of severe physical harm. *Estate of Matthews*, 2019 WL 1897154, at \*5. Despite this determination and its support in the record, this appeal is premised on Officer Hampton's version of events. Hampton attempts to dispute, for example, the district

court's conclusion that it is "doubtful" that his gun was loose in his holster, *id.* at *4 (citing video demonstration of double locked holster), by pointing to his own testimony that he realized his gun was loose from his double-lock holster. Hampton likewise argues against the district court's determination that, viewing the facts in Plaintiff's favor, including physical evidence, a reasonable juror could disbelieve Hampton's testimony that Matthews was standing over him and trying to get his gun when the shooting occurred. *Id.* These factual disputes are material to whether Hampton had probable cause to believe that Matthews posed a threat of severe physical harm, a minimum requirement for the use of deadly force. *Adams*, 946 F.3d at 949. In short, "what is at issue here are the facts themselves," not legal conclusions from the facts. *Franklin for Estate of Franklin v. Peterson*, 878 F.3d 631, 637 (8th Cir. 2017).

Because Hampton's legal arguments depend on factual disputes and credibility determinations, and Hampton has failed to concede the most favorable view of the facts to Matthews for purposes of the appeal, *Barry*, 895 F.3d at 443, or to show that any of these disputes are blatantly contradicted by the evidence, *Scott*, 550 U.S. at 380, we lack jurisdiction over this appeal.[2]

### III.   CONCLUSION

For the foregoing reasons, we **DISMISS** this case for lack of jurisdiction.

---

[2] Our colleague agrees in his separate writing that Hampton's legal arguments hinge on "factual uncertainties," yet concludes that we can resolve this appeal on the merits because Hampton claims to have conceded the most favorable view of the facts to the Plaintiff. The arguments Hampton raises do not comport with his claim that he does not challenge the district court's factual findings. For Hampton to succeed on appeal, moreover, we would have to resolve disputed facts in his favor and thereby overlook the district court's factual determinations. We do not have jurisdiction to do so.

**CHAD A. READLER, Circuit Judge, concurring in the judgment.** As the majority opinion correctly concludes, Officer Hampton is not entitled to qualified immunity. In reaching that conclusion, however, we should be careful in parsing factual and legal arguments. To be sure, purely factual challenges to the district court's findings are foreclosed on interlocutory review, except when the record blatantly contradicts a plaintiff's factual account. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007); *Johnson v. Jones*, 515 U.S. 304, 313 (1995). But simply because a party raises the factual aspects of a case does not automatically doom the appeal on jurisdictional grounds. Every advocate, after all, colors their case with their factual perspectives to some degree, reminding the reader that there are two sides to a story, even if, for legal argument's sake, a party ultimately must accept the other side's. *See Sevy v. Barach*, 815 F. App'x 58, 66–67 (6th Cir. 2020) (Readler, J., concurring in part and in judgment) (noting that "most arguments in [the qualified immunity] setting include features of both law and fact . . . [W]e do not dismiss the appeal on jurisdictional grounds merely because the defendant made some factual arguments or used aspects of her own factual account in mounting a legal argument for qualified immunity"). Nor is it uncommon for a party to plead alternative arguments, perhaps one turning on facts, and another, should the fact-based argument fail, on law. *See generally* Fed. R. Civ. Pro. 8(d). And in the qualified immunity setting, the appellate courthouse doors remain open to that legal argument. *See v. City of Elyria*, 502 F.3d 484, 489–90 (6th Cir. 2007).

Although Hampton disagrees with the district court's finding that Matthews was underneath Hampton at the time of the shooting, he expressly acknowledges his willingness to accept that factual conclusion for purposes of appeal. (Reply Br. at 2) ("Ofc. Hampton does not challenge the District Court's conclusions concerning factual matters . . . Ofc. Hampton [a]ccepts the facts in a light viewed most favorable to Plaintiff; Ofc. Hampton accepts Plaintiff's position

that Matthews was positioned below him.").  With that concession, Hampton argues that the district court erred as a legal matter by holding that his actions constituted excessive force in violation of clearly established Fourth Amendment precedent.  We should answer that identifiable legal question, rather than dismissing Hampton's appeal entirely because it also has a factual dimension.

That said, Hampton's legal argument lacks merit.  Whether Hampton's use of deadly force was excessive turns on whether he had "probable cause to believe that the suspect pose[d] a significant threat of death or serious physical injury to the officer or others."  *Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017) (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)).  Hampton justifies his conduct by contending that Matthews was reaching for the gun when Hampton fired his weapon, buttressing that point with the *legal* argument that in a deadly force case, a plaintiff cannot create a question of fact by asserting only speculative arguments as to why an officer's testimony is not believable, citing *Burnette v. Gee*, 137 F. App'x 806, 810–12 (6th Cir. 2005).  That argument may have some legal force.  *Cf. Romo v. Largen*, 723 F.3d 670, 678 (6th Cir. 2013) (Sutton, J., concurring) (arguing that *Johnson* does not mean that parties who claim qualified immunity must accept a district court's inferences from the facts).  But even if Hampton has fairly characterized the legal standard, his claim nevertheless fails to meet it.  With the factual uncertainties at play here, the district court did not err as a matter of law in concluding that there remained a genuine issue of material fact as to whether the plaintiff was trying to obtain the officer's gun.  In these circumstances, in other words, the jury could find excessive force.