NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0437n.06

Case No. 22-5169

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| SOPHIA PHEAP, as Administratrix, and Personal Representative of the Estate of Channara Pheap, | ) ) ) ) | **FILED** Oct 27, 2022 DEBORAH S. HUNT, Clerk |
| Plaintiff - Appellee, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |
| CITY OF KNOXVILLE, TENNESSEE, et al., | ) ) | |
| Defendant, | ) ) | OPINION |
| DYLAN M. WILLIAMS, | ) ) | |
| Defendant - Appellant. | ) ) ) | |

Before: GIBBONS, GRIFFIN, and STRANCH, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. Plaintiff-Appellee Sophia Pheap, administratrix of Channara Pheap's[1] estate, sued Defendant-Appellant Dylan M. Williams under 42 U.S.C. § 1983, claiming excessive force in violation of the Fourth Amendment, and under state law, alleging wrongful death, battery, and negligence. Williams moved for summary judgment on all claims, asserting for the federal claims that he was entitled to qualified immunity and for the state law claims that no genuine disputes of material fact existed and that he was entitled to judgment as a matter of law. The district court denied the motion, concluding that genuine disputes of material fact precluded summary judgment. On appeal, Williams argues that plaintiff's version of

---

[1] For clarity, Channara Pheap will be referred to as "Pheap" and Sophia Pheap will be referred to as "plaintiff."

events is blatantly contradicted by the record, and the district court erred by accepting it for the purposes of summary judgment. Because we lack jurisdiction, we dismiss the appeal.

I.

While on patrol on August 26, 2019, Dylan Williams, an officer with the Knoxville Police Department, learned from dispatch that a hit and run accident had occurred nearby. Dispatch described the suspect vehicle as a gold sedan and relayed the license plate number to Williams. Using the license plate number, Williams determined that the vehicle's registered owner lived in a nearby apartment complex. Williams drove to the apartments and saw a gold sedan in the parking lot with a license plate matching that of the suspect vehicle.

Williams parked his patrol car directly behind the gold sedan with his dash camera recording. Williams approached the apartment building and asked two individuals inside one of the apartments if they knew who drove the gold sedan. In response, a woman came out of the apartment and told Williams that the vehicle belonged to an individual who lived on the third floor of the building. The woman then directed Williams to a stairwell that led to the third floor. Williams proceeded to the stairs, leaving the view of his dash camera.

As he approached, Williams saw Channara Pheap descending the stairs. Williams described Pheap as nervous, fidgeting, and repeatedly trying to reach into his pockets. Williams also reported that he observed an item that he suspected might be a weapon in Pheap's pocket and that Pheap ignored several commands to keep his hands out of his pockets. According to Williams, Pheap would not maintain eye contact and appeared to be scanning his surroundings, which Williams interpreted as an effort to look for an escape route. Williams then requested a description of the suspect over his radio and was told that he was a "light to medium skin, black or Hispanic male," which Williams believed was consistent with Pheap's appearance.

Williams asked Pheap if he could conduct a pat down search of Pheap's pockets. As Williams attempted to search Pheap, a struggle ensued and both men rolled down the hill between the apartment buildings and into the view of Williams's dash camera. At one point, Williams claims that Pheap was on top of Williams and exerted significant force on Williams's neck, making it difficult for him to breathe. Pheap then got up and ran away from Williams into the parking lot, leaving the view of the dash camera. Williams pursued, also leaving the view of the dash camera, drew his taser, and disengaged its safety mechanism. Pheap stopped, put his hands up, and turned to face Williams. Williams approached Pheap and issued multiple commands to get on the ground.

At this point, conflicting stories emerge. According to Williams, Pheap lunged at him and grabbed the taser. After a brief struggle, Pheap gained complete control of the taser and pointed it directly at Williams. Williams turned, crouched down, and covered his face. Pheap fired the taser, and Williams felt the probes impact his body and electricity in his arms and neck. In response, and in an attempt to prevent a second taser attack, Williams drew his firearm and fired two shots at Pheap from approximately six or seven feet away. Williams claims that at the time he shot Pheap, Pheap was facing him and holding the taser. Pheap then turned away, ran a short distance, and fell to the ground.

Plaintiff, however, disputes Williams's version of events. First, plaintiff claims that Pheap never gained complete control of the taser but merely grabbed the taser's cartridge, and the taser errantly deployed during the struggle. Second, plaintiff points to expert testimony concluding that regardless of how the taser deployed, its probes did not contact Williams or shock him. Third, plaintiff contends that Pheap began to flee after the struggle over the taser and was four parking spaces away when Williams fired the two shots. Finally, plaintiff claims that Pheap was not

holding the taser and was not facing Williams when he was shot but had dropped the taser cartridge and was running away.

Several people witnessed the incident, but their accounts do not paint a conclusive picture of the moments preceding the shooting. For example, one eyewitness, April Barnard, told officers in October 2019 that she heard gunshots after Pheap dropped the taser, but in April 2021, she stated that Pheap was facing Williams and pointing the taser at him when Williams shot him. Frances Suttles, another eyewitness, stated in April 2021 that Pheap took Williams's taser and fired it at him, but she then said in her September 2021 deposition that she could not remember whether the taser deployed in the struggle or if Pheap aimed and fired it.

Similarly, forensic evidence failed to offer a definitive account of what happened. Dr. Christopher Lochmuller, the Chief Deputy Medical Examiner for Knox and Anderson Counties, determined that the Pheap died of a single gunshot wound to the left side of his upper back. Lochmuller posited three possible scenarios leading to the anatomical findings: (1) Pheap had his left side to Williams when Williams fired; (2) Pheap was facing Williams and turned when Williams drew his gun; or (3) Pheap had his back to Williams and turned back toward him as the gun was fired. Although he acknowledged that it was possible that Pheap had his back turned and was running away, Lochmuller opined that Pheap's left side was most likely facing Williams when he fired.

Plaintiff sued in her capacity as administratrix of Pheap's estate, alleging that Williams used excessive force in violation of Pheap's Fourth Amendment rights. After discovery, Williams moved for summary judgment, arguing that he is entitled to qualified immunity. The district court denied Williams's motion, finding that there exist genuine disputes of material fact as to what happened leading up to the shooting and thus summary judgment was not proper.

II.

We review a district court's legal analysis of qualified immunity de novo. *Jones v. City of Elyria*, 947 F.3d 905, 913 (6th Cir. 2020). "Qualified immunity shields government officials in the performance of discretionary functions from standing trial for civil liability unless their actions violate clearly established rights." *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 608 (6th Cir. 2015). At summary judgment, a government official is entitled to qualified immunity unless the evidence, viewed in the light most favorable to the plaintiff, would allow a jury to "reasonably find" that "(1) the defendant violated a constitutional right and (2) that right was clearly established." *Id.* at 608–09 (citation omitted).

As in other contexts, summary judgment in a qualified immunity case is warranted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In deciding a motion for summary judgment, [a] court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

Although the denial of summary judgment is typically not immediately reviewable, we have jurisdiction over an interlocutory appeal of the denial of qualified immunity. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). This jurisdiction, however, extends only to purely legal questions. *Id.* The denial of qualified immunity because there is a genuine issue of fact is not a purely legal question and thus not immediately appealable. *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995). Generally, if a defendant seeks an interlocutory appeal, he or she must be "willing to

concede the most favorable view of the facts to the plaintiff for purposes of the appeal." *Adams v. Blount Cnty.*, 946 F.3d 940, 948 (6th Cir. 2020) (citation omitted).

In *Scott v. Harris*, the Supreme Court recognized an exception to this jurisdictional rule. 550 U.S. at 380–81. A court of appeals, on interlocutory appeal, may reverse a district court's determination that a fact is subject to reasonable dispute only when one party's story is "blatantly contradicted by the record" so that "no reasonable jury could believe it." *Id.* at 380. For example, in *Scott*, the plaintiff argued that he was driving safely and posed no risk to others during a high-speed chase before an officer rammed his car off the road. *Id.* at 378–79. He asserted that he slowed for turns and intersections, used his turn signal, and maintained control of his vehicle. *Id.* Video capturing the events, however, showed the plaintiff driving at excessive speeds, swerving around vehicles, and forcing cars off the road. *Id.* at 379–80. The video "utterly discredited" plaintiff's version of events, rendering it a "visible fiction." *Id.* at 380–81. Under these circumstances, the Supreme Court held that it need not accept plaintiff's version of events and could instead consider the facts as depicted in the video. *Id.*

The *Scott* exception, however, is narrow. *Kindl v. City of Berkley*, 798 F.3d 391, 399 (6th Cir. 2015). It applies to "the rare case at the outer limit" in which the district court made a "blatan[t] and demonstrabl[e] error." *Landis v. Phalen*, 297 F. App'x 400, 404 (6th Cir. 2008) (quoting *Wysong v. City of Heath*, 260 F. App'x 848, 853 (6th Cir. 2008)).

On appeal, Williams argues that the *Scott* exception applies to this case. Specifically, Williams points to the dash camera video and anatomical evidence regarding the bullet's trajectory through Pheap's body and argues that these pieces of evidence undermine plaintiff's evidence such that her version of events cannot be believed.

The evidence Williams cites, however, does not paint a clear picture of what happened during or immediately preceding the shooting, and therefore, it does not blatantly contradict plaintiff's version of events. First, the dash camera video, unlike the video in *Scott*, does not actually capture the altercation immediately before the shooting or the shooting itself. Instead, the video captured only audio of a struggle, two gunshots, and Williams yelling out. Second, the autopsy report found that Pheap died of a gunshot wound to the back. The medical examiner could not conclusively determine Pheap's position in relation to Williams when he was shot, and he stated that one of the reasonable interpretations could be that Pheap had his back to Williams and turned to look at Williams as he fired the gun. This evidence, unlike in *Scott*, does not provide a conclusive account of the events and does not render plaintiff's version of events "a visible fiction."[2] *Scott*, 550 U.S. at 380–81. Accordingly, we hold that the *Scott* exception does not apply.

Absent the *Scott* exception, we lack jurisdiction over this interlocutory appeal because Williams does not concede plaintiff's version of events, and the factual disputes raised in the case are crucial. *See Adams*, 946 F.3d at 951 (holding that an appellate court lacks jurisdiction when factual disputes are "crucial to" the appeal). Here, the sequence of events immediately before the shooting is crucial to the question of whether Williams's use of force was reasonable.[3] To

---

[2] Although not made explicit, Williams seems to argue that the most reasonable interpretation of the dash camera video and anatomical evidence, when viewed alongside the bulk of the eyewitness testimony, supports his story. Based on this, Williams implies that the evidence supporting his story so outweighs the evidence supporting plaintiff's version of events that her version cannot be believed. Weighing the evidence in this manner, however, is inappropriate on interlocutory appeal. *See Johnson*, 515 U.S. at 313; *Kindl*, 798 F.3d at 399–401.

[3] The district court concluded that it was a clearly established violation of the Fourth Amendment to use deadly force against an unarmed, fleeing suspect when the officer did not have probable cause to believe the suspect posed a threat of serious physical. *See Bouggess v. Mattingly*, 482 F.3d 886, 891–92 (6th Cir. 2007). Thus, Williams violated Pheap's clearly established constitutional rights based on plaintiff's version of events but likely did not under Williams's version of events.

determine whether a constitutional violation occurred, we would need to decide whether to believe the evidence suggesting that Pheap was fleeing at the time he was shot or the evidence suggesting that Pheap was standing over Williams with the taser pointed at him. This type of factual determination is inappropriate on interlocutory appeal, and accordingly, we lack jurisdiction as to the federal claim.

## III.

Williams also moved for summary judgment on plaintiff's state-law claims of wrongful death, battery, and negligence. The district court denied the motion, finding that the same factual disputes that defeated summary judgment in the § 1983 context also precluded summary judgment for the state-law claims. On appeal, Williams argues that plaintiff's version of events is blatantly contradicted by the record and therefore no genuine dispute of material fact exists. The district court's order denying Williams's motion for summary judgment on the state-law claims is not a final reviewable order, however, because Williams did not assert an immunity defense to these claims.[4] *See United Pet Supply, Inc. v. City of Chattanooga*, 768 F.3d 464, 472 (6th Cir. 2014) ("Typically, the denial of summary judgment is a non-final order that cannot be appealed under 28 U.S.C. § 1291."). Therefore, we also lack jurisdiction as to the state-law claims.

## IV.

Accordingly, we dismiss Williams's appeal for lack of jurisdiction.

---

[4] In the district court, Williams did not assert state-law immunity to plaintiff's state-law claims. Instead, he simply argued that no material factual disputes existed, the force he used was reasonable, and plaintiff's state-law claims failed as a matter of law.