NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0529n.06
Filed: June 21, 2005

No. 04-5551

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| ONEITA J. BURNETTE and | ) | |
| PAMELA L. BROWN, | ) | |
| Co-Administrators of the estate of | ) | |
| Don Mark Wilson, and | ) | |
| PAMELA L. BROWN, individually and | ) | |
| as next friend for JONATHON WILSON, | ) | **ON APPEAL FROM THE UNITED** |
| a minor child, | ) | **STATES DISTRICT COURT FOR** |
| | ) | **THE WESTERN DISTRICT OF** |
| Appellants, | ) | **KENTUCKY, BOWLING GREEN** |
| | ) | **DIVISION** |
| v. | ) | |
| | | |
| JERRY "SLICK" GEE, | | |
| individually and as Sheriff of Monroe | | |
| County, Kentucky, and | | |
| MONROE COUNTY, KENTUCKY, | | |
| | | |
| Appellees. | | |

Before: COLE and SUTTON, Circuit Judges; BARZILAY, Judge.[*]

**BARZILAY, Judge.** This is a wrongful death case brought under the Fourth and

Fourteenth Amendments of the United States Constitution. Decedent's estate appeals the district

court's grant of summary judgment to both the officer who shot and killed decedent and to the

municipality that employed the officer. Because the district court did not err in finding that (1)

---

[*] The Honorable Judith M. Barzilay, Judge of the United States Court of International
Trade, sitting by designation.

the officer's conduct was reasonable under the circumstances, (2) the municipality's policy

regarding deadly force was not unconstitutional, and (3) the officer was entitled to official

immunity under Kentucky law for his actions, this Court affirms the district court's opinion.

**I. Background**

The tragic series of events in this case unfolded as follows. On April 2, 2002, Don Mark

Wilson (hereinafter "Wilson") attempted suicide in his trailer by taking an overdose of

prescription medication. A family member found Wilson unconscious and called 911. The 911

call was dispatched to the Monroe County Ambulance Service and shortly afterwards the

ambulance arrived at Wilson's trailer. Upon arrival, the ambulance staff learned that Wilson may

have attempted suicide and, following standard operating procedure, called for police assistance.

One of the paramedics, Paul McKiddy (hereinafter "McKiddy"), entered the trailer and

found Wilson sitting on the bed. He tried to persuade Wilson to go with him to the hospital but

Wilson refused. McKiddy testified that as he continued to plead with Wilson to get medical

treatment, Wilson picked up a rifle and held it in his lap. Joint Appendix (hereinafter J.A.) 260

(McKiddy Depo.). McKiddy also testified that when he informed Wilson that law enforcement

was coming, Wilson responded by saying that he would shoot anyone who tried to take him

away. J.A. 268 (McKiddy Depo.). McKiddy then left the trailer and waited in his ambulance for

the police to arrive. After McKiddy left the trailer, Ms. Burnette, Wilson's mother, helped him

move from the bed to a chair. While moving, Wilson, who usually had a cane, used his rifle as a

2

walking stick. J.A. 164, 171 (Burnette Depo.). After sitting down, Wilson kept the rifle on the

right side of the chair. *Id.* A few minutes later, Sheriff Jerry "Slick" Gee (hereinafter "Sheriff

Gee" or "Gee") arrived on the scene.

When Sheriff Gee was informed that a possible suicide was in progress by the police

dispatcher, he was also told that the suicidal subject had a gun and had threatened the employees

of the Ambulance Service with it. When he arrived at the trailer, two unidentified young men in

the front yard informed Sheriff Gee that Wilson had "gone crazy" and that he had a gun.

When Sheriff Gee entered the trailer, there were three persons present: Wilson, Ms.

Burnette, and Ms. Burnette's husband. Wilson was sitting in a chair with a rifle and neither of

the Burnettes said anything. Sheriff Gee testified that based on these facts, he believed that

either Wilson had threatened them or they were being held hostage. Sheriff Gee then asked

Wilson if the Burnettes could leave the trailer. After an affirmative response from Wilson, the

Burnettes left leaving Wilson and Sheriff Gee alone in the trailer. Ms. Burnette testified that

when she left the scene, Wilson was holding the barrel of the rifle outside the right arm of the

chair with the butt of the rifle resting on the ground.

The following sequence of events took place in a span of approximately two to three

minutes and the only witness to these events is Sheriff Gee. Sheriff Gee testified that he

repeatedly asked Wilson to put the gun down but Wilson refused. Wilson stood up from the

chair, held the rifle with his right hand near the trigger, and stated that he just wanted to die and

go to hell. J.A. 238. (Gee Depo.). Wilson sat back down in the chair, placing the butt of the rifle

between his right hip and the arm of the chair with the barrel pointing to the floor. J.A. 239 (Gee

Depo.). Wilson then reached down to put on his left shoe. J.A. 240 (Gee Depo.). Sheriff Gee

thought that this was a good opportunity to disarm Wilson, so he drew his own gun and charged

toward Wilson. *Id.* As Sheriff Gee approached Wilson, Wilson grabbed his rifle and raised it

towards Sheriff Gee. J.A. 241 (Gee Depo.). Sheriff Gee grabbed the rifle with his left hand and

tried to push it down since he felt the barrel of the rifle against his vest near his waist line. *Id.*

When Sheriff Gee was unable to wrestle the rifle from Wilson, he shot Wilson four times until he

ceased struggling. *Id.* Sheriff Gee testified that when Wilson grabbed the rifle and resisted

Sheriff Gee's attempt to disarm him, he believed that his life was in danger and he shot Wilson

to protect himself. J.A. 242 (Gee Depo.). Wilson died as a result of the gunshot wounds.

Plaintiff-Appellant Burnette, acting on behalf of Mr. Wilson's estate, filed suit under 42

U.S.C. § 1983 against Sheriff Gee and Monroe County, alleging that the fatal shooting of the

decedent, Don Mark Wilson, by Sheriff Gee violated Wilson's constitutional rights under the

Fourth and Fourteenth Amendments of the United States Constitution. Appellant also asserted

state law negligence claims against Sheriff Gee in his individual capacity. The Appellees moved

for summary judgment, and the district court granted summary judgment to the Appellees on the

federal claim and dismissed the state law claims. The district court held that Sheriff Gee did not

violate the Fourth or Fourteenth Amendments when he shot and killed Mr. Wilson.

Alternatively, the court held that if Sheriff Gee did violate those amendments, he is entitled to

4

qualified immunity. Plaintiffs timely appealed to this court the district court's grant of summary

judgment. We have jurisdiction over the district court's final judgment under 28 U.S.C. § 1291.

## II. Discussion

We review the district court's grant of summary judgment *de novo*. *McLean v. 988011*

*Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Summary judgment is proper where the

movant through "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, [shows] that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

"In deciding a motion for summary judgment, this court views the factual evidence and draws all

reasonable inferences in favor of the nonmoving party." *McLean*, 224 F.3d at 800. In order to

rebut a properly supported motion for summary judgment, the nonmovant must set forth some

evidence which, viewed in the light most favorable to him, could entitle him to a judgment.

*Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004) (citing *Cox v.*

*Ky. Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995)). "[A] nonmoving party may not avoid a

properly supported motion for summary judgment by simply arguing that it relies solely or in

part upon credibility considerations or subjective evidence. Instead, the nonmoving party must

present affirmative evidence to defeat a properly supported motion for summary judgment."

*Cox,* 53 F.3d at 150 (6th Cir. 1995). Furthermore, where the officer defendant is the only

witness left alive to testify, the award of summary judgment to the defense in a deadly force case

must be decided with particular care. *See Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994)

5

(The "defendant knows that the only person likely to contradict him or her is beyond reach . . . . [s]o a court must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at trial.").

Plaintiffs contend that the district court erred in granting summary judgment to Gee, arguing before this court that there is enough evidence to cast doubt on the defendant's version of the facts, and thus that there is a genuine issue of material fact as to whether Gee used excessive force against Wilson. We agree with the district court that under 42 U.S.C. § 1983, "[t]he sole constitutional standard for evaluating excessive force claims is the Fourth Amendment's criterion of reasonableness." *Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 772 (6th Cir. 2004). In evaluating the reasonableness of an officer's conduct, courts look to the totality of the circumstances including "[1] the severity of the crime at issue, [2] whether the suspect posed an immediate threat to the safety of others, and [3] whether he was actively resisting arrest or attempting to evade arrest by flight." *Gaddis*, 364 F.3d at 772 (internal quotation marks omitted).

## A. Constitutional Excessive Force Claims

The plaintiffs' argument below was two-fold: (1) that Gee's decision to make a gun-drawn charge towards Wilson when Wilson posed no immediate threat to Gee or anyone else was unreasonable; and (2) that even after Gee charged Wilson, it was unreasonable for Gee to

6

shoot Wilson because, they allege, Wilson did not lift up or point his rifle at Gee; instead, he maintained a rather innocent posture. The district court, however, determined that when evaluating the "reasonableness" of an officer's conduct, it is to look only to the direct moments preceding the attack, not to the fact that Gee charged Wilson. The district court then concluded that it was uncontested that Wilson had reached for his rifle and therefore, that Gee did not use excessive force because he reasonably feared for his own life.

**(1)**

Appellants rely on *Gaddis*, 364 F.3d 763, in support of the proposition that the district court should have considered Sheriff Gee's decision to charge at Wilson when evaluating the reasonableness of the shooting. *Gaddis,* however, is distinguishable from the instant case. In *Gaddis*, each of the moments preceding the shooting was evaluated as an individual instance of potential excessive force, whereas in this case, Sheriff Gee's charge towards Wilson cannot itself be construed as excessive force, as it did not involve any physical contact between Gee and Wilson. *Cf. Galas v. McKee*, 801 F.2d 200 (6th Cir. 1986) (finding that a high speed chase itself could not constitute excessive force where there was no physical contact with the suspect being chased). Furthermore, contrary to the Appellants' argument that even if Wilson did reach for his rifle, it was in response to Sheriff Gee's gun-drawn charge, Sheriff Gee's conduct cannot reasonably be construed as that which would or should have provoked Wilson to pick up his weapon. While courts have considered an officer's prior actions in their analysis of the reasonableness of the officer's subsequent actions towards a suspect, courts have only done so

7

where the prior actions involved excessive force or brutality against the suspect. *See, e.g.*

*Gilmere v. City of Atlanta*, 774 F.2d 1495, 1501 (11th Cir. 1985) (stating that "any fear on the

officer's part was the fear of retaliation against [the officer's] own unjustified physical abuse").

In this case, however, Sheriff Gee had not beaten or physically mistreated Wilson in any way

before attempting to disarm him. Thus, the district court correctly excluded Sheriff Gee's

charging of Wilson from its evaluation of his conduct.

**(2)**

Appellants also argue that issues of material fact exist as to whether Wilson even reached

for his rifle in response to Sheriff Gee's charge. Thus, Appellants argue that a jury could find

that Sheriff Gee's decision to shoot Wilson was unreasonable under the circumstances.

Appellants claim that circumstantial evidence and expert testimony show (1) that Wilson did not

have physical possession of the rifle when Sheriff Gee began his charge because the rifle was

located too far from Wilson's body as he bent down to tie his boot, (2) that in his disabled and

sedated state Wilson could not have reacted quickly or precisely enough to reach for the rifle,

and (3) that Wilson was shot before he was able to rise from his bent position.

The district court concluded that there was no conflicting testimony on these issues

because Gee and Wilson were the only two people to witness the event and because Wilson, now

deceased, cannot offer a competing version of facts. Consequently, the district court accepted

Gee's version of the shooting as true and decided that Gee did not violate Wilson's rights.

8

Unfortunately for the appellants, no direct evidence exists to rebut Sheriff Gee's version of the events. Furthermore, even considering the circumstantial evidence presented by Appellants in a light most favorable to them, there is no reasonable basis for overturning the district court's finding that Wilson reached for or raised his rifle and struggled with Sheriff Gee over the weapon, and that as a consequence, Sheriff Gee reasonably feared for his life when he shot Wilson. We believe that the district court's thorough analysis of the facts supports its grant of summary judgment in favor of Sheriff Gee. *See Plakas*, 19 F.3d at 1146-47.

First, Burnette testified that when she left the trailer moments before the shooting, her son held the rifle upright on the outside of the right arm of his chair. J.A. 171-72 (Burnette Depo.). Gee testified that immediately before the charge, Wilson had his rifle between his right hip and the inside arm of the chair with the barrel pointing to the floor. J.A. 238-39 (Gee Depo.). Appellants argue that in light of this conflicting testimony, this Court must view the rifle as Burnette remembers it, and consequently, the rifle was too far away from Wilson (who was bending over to his left shoe) such that he could have grabbed it as Gee claimed. As noted earlier, Gee claimed that after Burnette left the trailer, however, Wilson stood up with his gun, expressed his desire to die, and then sat down again. This testimony is uncontradicted. Given that there was some time, albeit two minutes at most, between when Burnette left the trailer and when Gee charged Wilson, it is certainly possible that Wilson shifted the position of his rifle slightly. Furthermore, even if Gee was incorrect about the position of the rifle prior to his charge, this inconsistency is not material because Appellants have presented no evidence that

9

Wilson would have been able to grab the rifle if it had been leaning on the inside arm of the chair, but not if it had been leaning on the outside arm of the chair.

Second, the Plaintiffs presented the district court with a "cause of death" report by Dr. George Nichols, who reviewed the autopsy evidence and concluded that the effects of the drugs consumed by Wilson prior to the shooting would result in "sedation rather than agitation and aggressive behavior." J.A. 92. This evidence is, at best, tenuous. If, for example, Dr. Nichols testified that Wilson would not have been able to react to Gee and reach over and pick up his rifle, then there would be a controverted material fact. In this case, however, the doctor's conclusion that the drugs taken by Wilson would have made him sedated does not actually conflict with Gee's statement that Wilson reached for and grabbed his rifle. By all accounts, Wilson was not asleep or unconscious and he was alert enough to talk to the paramedics, his family, and with Gee. Wilson could have been more sedated than usual, but still have managed to grab the rifle.

Finally, Appellants presented a report produced by Ronnie Freels, a forensic consultant, that concluded that Wilson was shot at close range (between twenty to ten inches) and that the "arm of victim Wilson was shot through first before the penetrating bullets struck the chest of the victim." J.A. 101 (including autopsy photo). Dr. Nichols, who is also a forensic pathologist, noted that Wilson's arm "could not have been significantly extended away from the body at the time of the shooting and the left hand could not have held or grabbed any object significantly away from Mr. Wilson's frontal abdomen." J.A. 91. Appellants claim that this evidence creates

10

a question as to whether Wilson really had his forty inch rifle pointing directly at Gee at the moment that Gee fired on him. However, Sheriff Gee did not claim that the rifle was pointed directly at him at the moment he fired upon Wilson. Instead, he claimed that he was in a struggle with Wilson and that they were wrestling for possession of the rifle when he fired. Therefore, Appellants' expert analysis does not contradict Gee's testimony of how the charge and shooting occurred.

In sum, the Appellants have not presented any evidence which disputes a material fact. The district court was correct when it concluded that "the testimony of others involved, including Ms. Burnette, Dr. Nichols . . . does not substantially contradict [Gee's] statement that Mr. Wilson reached for his rifle." J.A. 16. Consequently, we cannot find that Gee used or may have used excessive force against Wilson, because Gee could have reasonably feared for his own life. *See Brandenburg v. Cureton*, 882 F.2d 211, 215 (6th Cir. 1989) (*citing Young v. City of Killeen, Tex.*, 775 F.2d 1349, 1353 (5th Cir. 1985) ("The use of deadly force is reasonable if an officer believes that there is a threat of serious physical harm to the officer or others.")). Therefore, Sheriff Gee was entitled to summary judgment in his favor. Because this Court finds that Sheriff Gee did not violate Wilson's Fourth Amendment right to be free of excessive force, it need not address Appellants' arguments regarding qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

11

**B. Monroe County Policy on Deadly Force**

Appellants argue that Monroe County's unwritten policy regarding the use of deadly

force is unconstitutional because it gives no deference to the "totality of the circumstances"

faced by the County's officers and requires no consideration of the elements of "objective

reasonableness." This Court reviews *de novo* whether a municipality's policy is

unconstitutional. *See Petty v. United States*, 80 Fed. Appx. 986, 989, 2003 U.S. App. LEXIS

23560, *6 (6th Cir. 2003). Here, the policy complies with the principles annunciated by the

Supreme Court in *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985), that an officer may use deadly

force where a "suspect poses a threat of serious physical harm, either to the officer or to others . .

. ." *Id*. at 11; *see also Brandenburg v. Cureton*, 882 F.2d 211, 215 (6th Cir. 1989) (holding that

"deadly force is reasonable if an officer believes that there is a threat of serious physical harm to

the officer or others") (citation omitted). The Appellants have no support for the notion that it is

unconstitutional for a municipality to give officers discretion in determining whether a particular

suspect or situation poses an immediate danger that warrants the use of deadly force. In fact, the

prevailing law suggests the opposite:

> The reasonableness of a particular use of force must be judged from the
> perspective of a reasonable officer on the scene, rather than with the 20/20 vision
> of hindsight. . . . With respect to a claim of excessive force, the same standard of
> reasonableness at the moment applies . . . . The calculus of reasonableness must
> embody allowance for the fact that police officers are often forced to make split-
> second judgments -- in circumstances that are tense, uncertain, and rapidly
> evolving -- about the amount of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 397 (internal citations and quotation marks omitted); *see also Garner*, 471 U.S. at 11-12 (same).  Thus, the district court correctly found that the Monroe County policy on deadly force was not unconstitutional.

### C. State Law Negligence Claims

The district court retained supplement jurisdiction over Appellants' state law negligence claims and held that Sheriff Gee was entitled to official immunity because no evidence was presented that Sheriff Gee "acted in bad faith, with malicious intention or in reckless disregard" for Wilson's rights.  J.A. 24 (Memorandum Opinion at 9-10 (citing *Yanero v. Davis*, 65 S.W.3d 510, 523 (Ky. 2001)).  Appellants argue that by applying this "good faith" standard, the district court incorrectly assumed that Sheriff Gee's actions in attempting to take Wilson into custody were "discretionary" rather than "ministerial" functions.  Under Kentucky law, police officers are immune to negligence claims for their discretionary acts, unless it is shown that the officers committed the act in bad faith.  *Yanero*, 65 S.W.3d at 523.

Discretionary acts have been defined as those which "necessarily require the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued."  *Upchurch v. Clinton County*, 330 S.W.2d 428, 430 (Ky. Ct. App. 1959) (citation omitted).  Discretion in the manner of the performance of an act arises when "the act may be performed in one or two or more ways, either of which would be lawful, and where it is left to the will or judgment of the performer to determine in which way it

13

shall be performed." *Id.* Appellants cite cases indicating that an officer executing his duty to effect a seizure or arrest exercises only a ministerial function. *See Ashby v. City of Louisville*, 841 S.W.2d 184, 189 (Ky. 1992), *Downs v. United States*, 522 F.2d 990, 998 (6th Cir. 1975). In this case, however, unlike in *Ashby*, 841 S.W.2d at 189, Sheriff Gee was not performing a mandatory arrest. When he received the dispatch call, he was merely responding to a possible suicide situation. Later he learned that the victim had a gun and may have threatened others. There was no indication that an arrest needed to be accomplished, and if one did, there were multiple ways of going about it. There were no "fixed and designated facts" requiring a specifically delineated response from Sheriff Gee. Consequently, the approach in investigating Wilson's attempted suicide and the ultimate seizure of Wilson was a discretionary rather than ministerial act. Because the Appellants have not shown that Gee's actions were done in bad faith, the district court correctly dismissed the negligence claims.

We cannot end our discussion of this case without acknowledging the personal and family tragedy it relates. We believe the district court said it eloquently and we quote from its opinion: "Finally, this Court notes that nothing in this opinion is meant to trivialize or diminish the tragedy that occurred on April 2, 2002, or to excuse Sheriff Gee's conduct on that day. It may be that in retrospect his actions were rash, foolish, or unwise. Such actions, however, do not give rise to claims under the law this Court is obligated to follow." Accordingly, the district court's opinion is hereby affirmed.