IN THE UNITED STATES DISTRICT COURT 
 FOR THE NORTHERN DISTRICT OF OHIO 
 EASTERN DIVISION 

 KATHLEEN HOGAN, ) CASENO. □ 1:20 CV 1331 
 ) 
 Plaintiff, ) 
 ) 
 v. ) JUDGE DONALD C. NUGENT 
 ) 
 ) 
 CITY OF PARMA, OHIO, et al., ) MEMORANDUM OPINION 
 ) 
 Defendants. ) 

 This matter is before the Court on the Motion for Summary Judgment filed by 
 Defendants, City of Parma and City of Parma Police Officer Peter Shepetiak (“Officer 
 Shepetiak”). (Docket #37.) 
 I. Factual and Procedural Background.! 
 On June 20, 2018, while working traffic enforcement in the City of Parma, Ohio, Officer 
 Shepetiak stopped a car driven by Jonathan Legg. Prior to the traffic stop, Officer Shepetiak had 

- randomly entered Mr. Legg’s license plate number into his Mobile Data Terminal and 
 discovered that the license plate on Mr. Legg’s car was registered to a different vehicle.
 The facts as stated in this Memorandum Opinion and Order are taken from the 
 Parties’ submissions. Those material facts that are controverted and supported by 
 deposition testimony, affidavit, or other evidence are stated in the light most favorable to 
 the non-moving Party. 

(Deposition of Officer Peter Shepetiak (“Shepetiak Depo.”), Docket # 37-1, at pp. 50-52.) As 
they were passing in opposite directions, Officer Shepetiak made eye contact with Mr. Legg. 
Officer Shepetiak testified that Mr. Legg “rapidly turned away” and “scooted down into his 
seat.” (Id. at p. 53.) Officer Shepetiak then turned his car around; got behind Mr. Legg’s car; 
activated his lights and sirens; and, Mr. Legg stopped after “quarter mile plus.” (Id. at p. 55.) In 
a statement immediately following this incident, Officer Shepetiak indicated that Mr. Legg 
continued to drive for almost a half mile before stopping. (Id. at p. 81.) 
 After Mr. Legg had stopped, and either just prior to or right after Officer Shepetiak 
approached Mr. Legg, Detective Luke Berry of the neighboring City of Parma Heights Police 
Department arrived on the scene. Detective Berry was off-duty and his police radio was tuned to 
the City of Parma’s police channel at the time of Officer Shepetiak’s call for back-up, in which 
he indicated that the plates on the vehicle he was pursuing did not match the vehicle. (Deposition 
of Detective Luke Berry (“Berry Depo.”), Docket #37-2 at pp. 33-34.) Detective Berry then saw 
Officer Shepetiak drive past him with his lights on, “chirping his siren.” Detective Berry 
testified that it “didn’t look like [Mr. Legg was] making any attempt to stop;” that he thought it 
might be a pursuit; that [Mr. Legg] “looked like he was deciding whether or not he was actually 
going to stop;” and, “then after chirping the siren a couple times, [Mr. Legg] eventually pulled 
over.” (Id. at p. 34.) Detective Berry was “right there;” believed backup was several minutes 
away; and, stopped to assist Officer Shepetiak. Detective Berry testified that “due to what [he] 
had just seen and the elevated risk that — if the plates don’t match the car, you don’t know who 
the owner is, you don’t know — it could be a stolen car, it could be a lot of things. So we — we 
always send two cars to that kind of a traffic stop until you figured it out.” (Id. at p. 35.) 

 -2- 

 Detective Berry turned his car around; pulled up behind Officer Shepetiak; turned his 
lights on; and, walked up and waited near the front of Officer Shepetiak’s police cruiser so as not 
to distract or surprise him. (Id.) Detective Berry was in plain clothes, wearing a shirt, tie and 
dress pants, with his badge on his right hip. (Id. at p. 36.) 
 Officer Shepetiak approached the passenger side of Mr. Legg’s vehicle; introduced 
himself and explained the reason for the traffic stop; and, asked for Mr. Legg’s driver’s license 
and insurance. (Shepetiak Depo. at p. 58.) Officer Shepetiak testified that Mr. Legg explained 
that “the plates that were on his current vehicle belonged to another vehicle that was in a shop.” 
(Id.) Officer Shepetiak testified that Mr. Legg appeared nervous — his hands were trembling, he 
was breathing heavily and sounded shaky — but that Mr. Legg was initially cooperative. (Id.) 
Officer Shepetiak then questioned Mr. Legg regarding whether he had anything illegal in the 
vehicle, including weapons. (Id. at p. 59.) Mr. Legg focused on the center console area and 
replied “no.” (Id.) Officer Shepetiak stated that he made eye contact with Mr. Legg “at points,” 
but that Mr. Legg “broke eye contact quite a bit.” (Id. at 60.) 
 Detective Berry also spoke to Mr. Legg briefly through the passenger side window. 
Detective Berry testified that Mr. Legg was “rifling through papers” and “holding an e-check 
paper and talking about something with e-check.” (Berry Depo. at p. 37.) Detective Berry 
thought that an issue with e-check requirements may have prevented Mr. Legg from renewing 
his license plates, thus explaining why he “put false plates on the car.” (Id. at p. 38.) Detective 
Berry testified that Mr. Legg was uncontrollably shaking and so nervous that he couldn’t hold his 
hands still. Detective Berry stated that Mr. Legg’s voice was shaky but, other than that, Mr. 
Legg was coherent and sensible. (Id.) Detective Berry testified that Mr. Legg “largely avoided 

 -3- 

eye contact” and that his focus was “primarily down into the center console.” (Id. at p. 39.) 
 During that time, Officer Shepetiak had walked to the driver’s side of the car; briefly 
looked at the car’s VIN number; and, because he felt that Mr. Legg was “nervous beyond what a 
normal traffic stop” would cause, asked permission to search the vehicle. (Shepetiak Depo. at p. 
62.) Detective Berry testified he believed a search was warranted given the extended time Mr. 
Legg took to pull over; the way Mr. Legg was fixated on the center console; the fact that the 
license plates did not match the car; and, because Mr. Legg was unusually nervous and could not 
control his nervousness. (Berry Depo. at pp. 40-41.) Mr. Legg agreed to the search and Officer 
Shepetiak asked Mr. Legg to step out of the vehicle. As Mr. Legg stepped out, Officer Shepetiak 
asked Mr. Legg to face the opposite direction and put his hands on the roof of the car so that he 
could conduct a pat down for weapons. (Shepetiak Depo. at p. 65.) 

 _ Detective Berry testified that up until that time, the traffic stop had been “very normal,” 
until he saw Mr. Legg’s “right hand shoot into the area of his waistband or right side, right hip 
side.” (Berry Depo. at p. 45.) Detective Berry gave Mr. Legg a “verbal command for [Mr. Legg] 
to not — to show us his hands, because he started going down with his hands, and not to reach in 
his waistband.” (Shepetiak Depo. at pp. 69-70.) Detective Berry testified that he gave multiple 
verbal commands to that effect. (Berry Depo. at p. 49.) Detective Berry stated that he does not 
remember ever yelling the word “gun.” (Berry Depo. at p. 48-50.) 
 Officer Shepetiak did not have an opportunity to pat Mr. Legg down, nor did he see a 
gun, but his deposition testimony reflects that he believed Mr. Legg had a gun. (Shepetiak Depo. 
at pp. 74-78.) Officer Shepetiak testified that Mr. Legg’s “hands dropped down in front of him,” 
leading him to believe the gun was in his waistband. Officer Shepetiak immediately “grabbed 

 -4- 

[Mr. Legg] . . . attempt[ing] to restrain him from grabbing his gun.” (Id. at p. 73.) A witness to 
the incident, Jennifer Belcik, who was driving by at the time, stated via Affidavit that she saw 
Mr. Legg “start to wrestle with” Officer Shepetiak, who was “trying to hold on” to Mr. Legg. 
(Affidavit of Jennifer Belcik (“Belcik Affidavit”), Docket #37-3 at Paragraph 7.) 
 During that attempted restraint, Mr. Legg grabbed his gun and fired it numerous times, 
with one bullet hitting Detective Berry in the knee. (Shepetiak Depo. at p. 84.) Ms. Belcik 
stated that she witnessed Mr. Legg “pull out a gun and begin shooting” at Detective Berry and 
that Detective Berry then “grabbed his knee.” (Belcik Affidavit at Paragraphs 8 and 9.) 
Detective Berry testified that he first realized Mr. Legg had a gun when he heard the first 
gunshot, but that the first gunshot did not hit him. (Berry Depo. at p. 47.) Officer Shepetiak 
testified, “It’s all milliseconds of how it happened, sir. He grabbed his gun — or I was notified 
that there was a gun. His hands went down. J went to restrain him, and J don’t even think I had 
a full, quote on, quote off, bear hug on him before he shot Detective Berry in the leg.” Ms. 
Belcik stated in her Affidavit that after Officer Shepetiak separated from Mr. Legg “who was 
shooting, both Officers shot back” at Mr. Legg. (Belcik Affidavit at Paragraph 10.) Officer 
Shepetiak stated that he started shooting when he “told [himself] that [he] had to do something 
or [he was] going to die.” (Shepetiak Depo. at p. 85.) Officer Shepetiak fired his gun 5 to 7 
times, fatally injuring Mr. Legg. (Shepetiak Depo. at p. 86.) 
I. The Complaint. 
 On June 18, 2020, Kathleen Hogan, Mr. Legg’s mother, as Administrator of Mr. Legg’s 
Estate, filed this lawsuit against the City of Parma, the City of Parma Heights, Officer Shepetiak 
and Detective Berry, alleging that the policies and practices of the City of Parma and the City of 

 -5- 

Parma Heights, along with a failure to properly train officers regarding interactions with 
individuals suffering from autism and/or other mental health disorders, ultimately caused the 
death of Mr. Legg, who was autistic. Ms. Hogan asserted a claim under 42 U.S.C. § 1983 for 
unreasonable search and seizure and use of excessive force (First Cause of Action); a claim for 
wrongful death under Ohio Rev. Code § 2125.02 (Second Cause of Action); and, a claim 
alleging Defendants “intentionally discriminated against Jonathan Legg or failed to provide him 
a reasonable accommodation when they used unnecessary and excessive force against him 
because of his disability,” in violation of Title II of the Americans With Disabilities Act (Third 
Cause of Action. 

 On August 17, 2020, Defendants Luke Berry and the City of Parma Heights filed a 
Motion for Judgment on the Pleadings. (Docket #12.) On October 2, 2020, Defendants City of 
Parma and Officer Shepetiak filed a Motions for Judgment on the Pleadings. (Docket #20.) On 
December 18, 2020, this Court granted Defendants’ Motions for Judgment on the Pleadings only 
as to Ms. Hogan’s Americans with Disabilities Act Claim (Third Cause of Action). On April 2, 
2021, the Court granted Ms. Hogan’s unopposed Motion to Drop Certain Parties, dismissing 
Detective Berry and the City of Parma Heights from this case. (Docket #34.) Ms. Hogan’s 
excessive use of force and wrongful death claims against Officer Shepetiak and the City of 
Parma remain. 

III. Motions for Summary Judgment. 
 On April 19, 2021, Officer Shepetiak and the City of Parma filed a Motion for Summary 
Judgment (Docket #37); Ms. Hogan filed a Memorandum in Opposition on May 19, 2021 
(Docket #39); and, a Reply Brief was filed on May 28, 2021 (Docket #45). As set forth in the 

 -6- 

briefing, Ms. Hogan’s claims regarding excessive force relate to the actions taken by Officer 
Shepetiak to restrain Mr. Legg, which she claims were unnecessary, unwarranted and 
unnecessarily escalated the circumstances, resulting in the exchange of gunfire and Mr. Legg’s 
wrongful death. Ms. Hogan argues that the City of Parma failed to adequately train its officers 
for encounters involving autistic citizens, and that the alleged lack of training resulted in the use 
of excessive force against her son. 

IV. Standard of Review. 

 Summary judgment is appropriate when the court is satisfied “that there is no genuine 
issue as to any material fact and that the moving party is entitled to a judgment as a matter of 
law.” FED. R. Civ. P. 56(a). The burden of showing the absence of any such “genuine issue” 
rests with the moving party: 
 [A] party seeking summary judgment always bears the initial responsibility of 
 informing the district court of the basis for its motion, and identifying those portions 
 of ‘the pleadings, depositions, answers to interrogatories, and admissions on file, 
 together with affidavits, if any,’ which it believes demonstrates the absence of a 
 genuine issue of material fact. 

Celotex v. Catrett, 477 U.S. 317, 323 (1986). A fact is “material” only if its resolution will 
affect the outcome of the lawsuit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). 
Determination of whether a factual issue is “genuine” requires consideration of the applicable 
evidentiary standards. The court will view the summary judgment motion in the light most 
favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 
475 U.S. 574, 587 (1986). 
 Summary judgment should be granted if a party who bears the burden of proof at trial 
does not establish an essential element of their case. Tolton v. American Biodyne, Inc., 48 F.3d 

 -7- 

937, 941 (6" Cir. Ohio 1995) (citing Celotex, 477 U.S. at 322). Accordingly, “[t]he mere 
existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there 
must be evidence on which the jury could reasonably find for the plaintiff.” Copeland v. 
Machulis, 57 F.3d 476, 479 (6" Cir. Mich. 1995) (citing Anderson, 477 U.S. at 252). Moreover, 
if the evidence presented is “merely colorable” and not “significantly probative,” the court may 
decide the legal issue and grant summary judgment. Anderson, 477 U.S. at 249-50 (citations 
omitted). 
 Once the moving party has satisfied its burden of proof, the burden then shifts to the 
nonmoving party. The nonmoving party may not simply rely on its pleadings, but must “produce 
evidence that results in a conflict of material fact to be solved by a jury.” Cox v. Kentucky Dep’t 
of Transp., 53 F.3d 146, 149 (6" Cir. Ky. 1995). FED. R. CIv. P. 56(e) states: 

 When a motion for summary judgment is made and supported as provided in this 
 rule, an adverse party may not rest upon the mere allegations or denials of the 
 adverse party’s pleading, but the adverse party’s response, by affidavits or as 
 otherwise provided in this rule, must set forth specific facts showing that there is 
 a genuine issue for trial. 

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as 
an automatic grant of summary judgment, where otherwise appropriate. Id. 

 As a general matter, the district judge considering a motion for summary judgment is to 
examine “[o]nly disputes over facts that might affect the outcome of the suit under governing 
law.” Anderson, 477 U.S. at 248. The court will not consider non-material facts, nor will it 
weigh material evidence to determine the truth of the matter. Jd. at 249. The judge’s sole 
function is to determine whether there is a genuine factual issue for trial; this does not exist 

 . -8- 

unless “there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for 
that party.” Id. 

 In sum, proper summary judgment analysis entails “the threshold inquiry of determining 
whether there is the need for a trial--whether, in other words, there are any genuine factual issues 
that properly can be resolved only by a finder of fact because they may reasonably be resolved in 
favor of either party.” Anderson, 477 U.S. at 250. 

V. Discussion. 

 A. First Cause of Action — Claims Brought Pursuant to 42 U.S.C. § 1983. 

 In order to prevail on a claim brought pursuant to § 1983, a plaintiff must establish by a 
preponderance of the evidence that a person acting under the color of law deprived him of a right 
secured by the United States Constitution or the laws of the United States. Smoak v. Hall, 460 
F.3d 768, 777 (6" Cir. Tenn. 2006). A violation of § 1983 must be intentional or knowingly 
committed in order to be compensable. A negligent or reckless deprivation is not sufficient. 
Ahlers v. Schebil, 188 F.3d 365, 373 (6" Cir. Mich. 1999). Further, an injury caused by mere 
negligence, that does not rise to the level of a constitutionally protected interest, is not 
compensable under §1983. See Collins v. City of Shaker Heights, 503 U.S. 115 (1992). 
 Government officials are protected from liability for civil damages, including those that 
arise under §1983, “insofar as their conduct does not violate clearly established statutory or 
constitutional rights of which a reasonable person would have known.” Pearson v. Callahan, 
555 USS. 223, 231 (2009). Qualified immunity protects “all but the plainly incompetent or those 
who knowingly violate the law.” Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011). To determine 

 -9- 

whether qualified immunity applies in a given case, we use a two-step analysis: (1) viewing the 
facts in the light most favorable to the plaintiff, we determine whether the allegations give rise to 
a constitutional violation; and (2) we assess whether the right was clearly established at the time 
of the incident. Campbell v. City of Springboro, Ohio, 700 F.3d 779, 786 (6" Cir. Ohio 2012); 
see also Saucier v. Katz, 533 U.S. 194, 201 (2001). We can consider these steps in any order. 
Pearson v. Callahan, 555 U.S. 223, 236 (2009). However, “If there is no constitutional 
violation, then plaintiff's § 1983 claim fails as a matter of law and the defendant is therefore 
entitled to summary judgment and does not need qualified immunity.” Marvin v. City of Taylor, 
509 F.3d 234, 244 (6" Cir. Mich. 2007)(citing Scott v. Harris, 127 S. Ct. 1769, 1779 (2007)). 
 1. Excessive Force — Officer Shepetiak. 
 Excessive force claims are analyzed under the Fourth Amendment’s reasonableness 
standard. See Graham v. Connor, 490 U.S. 386, 395 (1989). This standard encompasses “a 
built-in measure of deference to the officer’s on-the-spot judgment about the level of force 
necessary in light of the circumstances of the particular case.” Burchett v. Kiefer, 310 F.3d 937, 
944 (6th Cir. Ohio 2002) (citing Graham, 490 U.S. at 396). It “allow[s] for the fact that police 
officers are often forced to make split-second judgments — in circumstances that are tense, 
uncertain, and rapidly evolving—about the amount of force that is necessary in a particular 
situation." Graham, 490 U.S. at 396-97. The factors considered in assessing a constitutional 
excessive force claim include the particular facts and circumstances of each case, the severity of 
the crime, the threat posed by the suspect, and whether the suspect is “actively resisting arrest or 
attempting to evade arrest by flight.” Graham, 490 U.S. at 396. “The ‘reasonableness’ of the 
particular use of force must be judged from the perspective of a reasonable officer on the scene, 

 -10- 

rather than with the 20/20 vision of hindsight.” Graham, 490 U.S. at 396. “An officer should be 
entitled to qualified immunity if he made an objectively reasonable mistake as to the amount of 
force that was necessary under the circumstances with which he was faced.” Solomon v. Auburn 
Hills Police Dept., 389 F.3d 167, 175 (6th Cir. Mich. 2004) (citation omitted). 
 There was no use of force by Officer Shepetiak when he pulled Mr. Legg over; no use of 
force by Officer Shepetiak when he spoke to Mr. Legg regarding his license plate; no use of 
force by Officer Shepetiak when he asked Mr. Legg for permission to search the car; no use of 
force by Officer Shepetiak when he asked Mr. Legg to exit the vehicle; and, no use of force by 
Officer Shepetiak when he asked Mr. Legg to turn around and place his hands on the vehicle so 
that he could check Mr. Legg for weapons. Officer Shepetiak used force only upon being alerted 
by Detective Berry that Mr. Legg appeared to be reaching for something in his waistband and 
observing the same, and that use of force was objectively reasonable. Officer Shepetiak made a 
split-second judgment to “bear hug” Mr. Legg in an attempt prevent the situation from 
escalating. Officer Shepetiak’s attempt to restrain Mr. Legg with a “bear hug” was reasonable 
and not excessive given the perceived threat, and ultimately not even enough force to prevent 
Mr. Legg from accessing the gun concealed in his waistband and shooting Detective Berry. 
Officer Shepetiak used no more force than necessary in his attempt to restrain Mr. Legg in 
response to his objectively reasonable belief that, at that moment, he needed to stop Mr. Legg 
from reaching for a weapon. There is no evidence from which a reasonable juror could find 
otherwise. 

 Further, given the fact that Mr. Legg was firing a gun at Officer Shepetiak and Detective 
Berry and shot Detective Berry, the Officers were reasonable in responding with deadly force, as 

 -11- 

they most certainly had probable cause to believe that Mr. Legg posed an imminent threat of 
severe physical harm to themselves and others. The use of deadly force under the circumstances 
was not a violation of Mr. Legg’s Fourth Amendment rights. Untalan v. City of Lorain, 430 
F.3d 312, 314 (6" Cir. Ohio 2005); Burnette v. Gee, 137 Fed. Appx 806, 810 (6" Cir. Ky. 2005). 
 Ms. Hogan argues that Officer Shepetiak “used excessive force and escalated the 
situation when he grabbed an autistic man from behind and attempted to throw him to the ground 
at a point in time when Jonathan was not under arrest; was not resisting; was not fleeing; and 
posed no immediate threat of harm to Defendant Shepetiak or anyone else.” The undisputed 
facts demonstrate that this was a routine traffic stop — until the point when Officer Shepetiak and 
Detective Berry correctly identified the fact that Mr. Legg was reaching for something in his 
waistband. There was no use of force until that point. While both officers testified that Mr. 
Legg seemed quite nervous, there is no evidence that Officer Shepetiak or Detective Berry had 
any knowledge whatsoever that Mr. Legg may be autistic or mentally disabled, and their actions 
throughout the traffic stop, under the circumstances, were reasonable regardless. Mr. Legg 
suffered no Constitutional injury at the hands of Officer Shepetiak. Officer Shepetiak’s “bear 
hug” was a reasonable use of force. Accordingly, Officer Shepetiak is entitled to summary 
judgment on Ms. Hogan’s Section 1983 claim as a matter of law. 

 2. Failure to Train — Defendant City of Parma. 

 Ms. Hogan is also pursuing a Fourth Amendment claim against the City of Parma, 
arguing that the City of Parma failed to adequately train its police officers in dealing individuals 
who have autism or Asperger’s Syndrome and that the City’s policies and practices led to Mr. 
Legg’s death. 

 -]2- 

 “A municipality may not be held liable under § 1983 on a respondeat superior theory.” 
Monell v. Dep’t of Soc. Servs., 436 U.S. 658, 691 (1978). When an action is brought under 42 
U.S.C. § 1983 against a municipality, plaintiff must show that, due to its deliberate conduct, the 
municipality was the “moving force” behind the injury alleged. Wright v. City of Euclid, 962 
F.3d 852, 879 (6" Cir. Ohio 2020) citing Alman v. Reed, 703 F.3d 887, 903 (6" Cir. Mich. 2013). 
This requires plaintiff to demonstrate that “the municipality had a ‘policy or custom' that caused 
the violation of his rights.” Jd. at 880 (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690). 
To state a cause of action, a plaintiff must demonstrate “(1) the existence of an illegal official 
policy or legislative enactment; (2) that an official with final decision making authority ratified 
illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the 
existence of a custom of tolerance or acquiescence of federal rights violation.” Id.; see Jackson v. 
City of Cleveland, 925 F.3d 793, 828 (6" Cir. Ohio 2019). To properly plead a claim premised 
on inadequate training, the Supreme Court has held that “inadequacy of police training may 
serve as the basis for § 1983 liability only where the failure to train amounts to deliberate 
indifference to the rights of persons with whom the police come into contact.” City of Canton v. 
Harris, 489 U.S. 378, 388 (1989). 
 Regarding municipal liability under § 1983, the Supreme Court has held that if the officer 
inflicted no constitutional injury on a person, then it is “inconceivable” that the City could be 
liable to the person. DeMerrell v. City of Cheboygan, 206 Fed. Appx. 418, 429 (6™ Cir. Mich. 
2006) (citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)(per curiam)). If □□ person 
has suffered no constitutional injury at the hands of the individual police officer, the fact that 
department regulations might have authorized the use of constitutionally excessive force is quite 

 -13- 

beside the point.” City of Los Angeles v. Heller, 475 U.S. 796, 799. 

 As stated above, Mr. Legg suffered no constitutional injury at the hands of Officer 
Shepetiak. Accordingly, there is no basis upon which to find the City liable under Section 1983. 
Furthermore, Ms. Hogan asserted, without providing any supporting evidence, that the City of 
Parma failed to adequately train its police officers to deal with citizens who have autism or 
Asperger’s syndrome. There is no evidence in the record, at all, regarding the training that the 
City of Parma does or does not provide to its police officers and, while Officer Shepetiak could 
not remember the specifics of his prior training regarding individuals with disabilities, that alone 
does nothing to establish that the City of Parma acted with a deliberate indifference to the rights 
of those with whom the police come into contact.” Accordingly, the City of Parma is entitled to 
summary judgment on Ms. Hogan’s Section 1983 claim for failure to train as a matter of law. 

 B. Second Cause of Action - Wrongful Death, Ohio Rev. Code § 2125.01. 

 1. Officer Shepetiak. 
 Pursuant to Ohio Rev. Code § 2744.03(A)(6), employees of a political subdivision are 
immune from “a civil action brought . . . to recover damages for injury, death, or loss to persons
 Officer Shepetiak testified during deposition that he believes he “had training how 
to deal with individuals with mental health disabilities,” but was not certain whether the 
training specifically included discussion of autism. He testified he is not familiar with the 
mannerisms of a person with autism or Asperger’s syndrome. (Shepetiak Depo. at p. 23- 
30.) Although Ms. Hogan alleges that the City did not provide adequate training and that 
autism-specific training would have been helpful in this situation, she offers no evidence 
in support of the same. Again, the Officers did not know that Mr. Legg was autistic and 
there is no evidence that had they known, they would have responded differently under 
the circumstances. Up until the Officers correctly perceived that Mr. Legg was reaching 
for a weapon, the entirety of the interaction between the Officers and Mr. Legg was calm 
and uneventful and Officer Shepetiak’s “bear hug” restraint was objectively reasonable. 
 -14- 

or property allegedly caused by any act or omission in connection with a governmental or 
proprietary function,” unless the employee acted outside the scope of his employment, acted 
“with malicious purpose, in bad faith, or in a wanton or reckless manner,” or unless “liability is 
expressly imposed upon the employee by a section of the Revised Code.” Ohio Rev. Code § 
2744.03(A)(6)(a)-(c). The provision of police services is a governmental function. Ohio Rev. 
Code § 2744.01(C)(2)(a). 
 “Malicious purpose encompasses exercising ‘malice,’ which can be defined as the willful 
and intentional design to do injury, or the intention or desire to harm another, usually seriously, 
through conduct that is unlawful or unjustified.” Caruso v. State, 136 Ohio App.3d 616, 620, 
737 N.E.2d 563 (10" Dist. Ct. App. 2000) (citing Jackson v. Butler Cty. Bd. of Cty. Comm'rs., 76 
Ohio App.3d 448, 453-454, 602 N.E.2d 363 (12" Dist. Ct. App. 1991)). An act is committed 
recklessly if it is done “with knowledge or reason to know of facts that would lead a reasonable 
person to believe that the conduct creates an unnecessary risk of physical harm and that such risk 
is greater than that necessary to make the conduct negligent.” Caruso, 136 Ohio App. 3d at 621 
(citing Hackathorn v. Preisse, 104 Ohio App.3d 768, 771, 663 N.E.2d 384 (9" Dist. App. 
1995)). 
 For the reasons outlined above, Officer Shepetiak’s actions under the circumstances were 
reasonable and there is no evidence that his attempted restraint of Mr. Legg in response to a 
perceived threat, or the use of deadly force, both of which occurred within the scope of his 
employment, were the result of malice, or that Officer Shepetiak acted in bad faith or in a 
wanton or reckless manner. No reasonable juror could find otherwise. Accordingly, Officer 
Shepetiak is statutorily immune from Ms. Hogan’s State law wrongful death claim and is entitled 
to summary judgment as a matter of law. 
 _15_ 

 2. The City of Parma. 

 The provision of police services, including the training and supervision of police 
officers, is a governmental function and none of the exceptions to municipal statutory immunity 
apply. Ohio Rev. Code § 2744.02(A)(1); 2744.02(B); McCloud v. Nimmer, 72 Ohio App. 3d 
533, 536-38 (Ohio Ct App. 8" Dist. 1991). Accordingly, the City of Parma is statutorily immune 
from Ms. Hogan’s State law wrongful death claim and is entitled to summary judgment as a 
matter of law. 

VI. Conclusion. 

 The facts of this case profoundly illustrate the inherent danger police officers face when 
engaging in a traffic stop. Police officers must be observant, courteous, patient and vigilant ~ 
and, no matter how minor the offense, must never assume that a traffic stop will be “routine.” In 
this case, what appeared to be a “routine” traffic stop, escalated into a fatal encounter when Mr. 
Legg reached for and grabbed his firearm and began shooting at the Officers, wounding 
Detective Berry and, as a result, suffered mortal wounds himself. The evidence presented in this 
case definitively demonstrates that Officer Shepetiak and Detective Berry acted reasonably and 
professionally throughout their encounter with Mr. Legg. The actions taken by both Officers to 
defend themselves and protect the public, in response to the immediate threat of danger on a 
public thoroughfare, were unquestionably proper, reasonable and necessary. 
 The Motion for Summary Judgment filed by Defendants, City of Parma and Officer Peter 
Shepetiak, (Docket #37) is hereby GRANTED. 

 This case is hereby TERMINATED. 

 -16- 

IT IS SO ORDERED. 

 DONALD C. =H 
 Senior United States District Judge 
DATED: ve | ! )or | 

 -17-