NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0072n.06

No. 24-1079

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| BERNARD HOWARD, | ) | |
| Plaintiff - Appellee, | ) ) | **FILED**<br>Feb 07, 2025<br>KELLY L. STEPHENS, Clerk |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| DALE COLLINS; WILLIAM RICE; STEVEN MYLES; MONICA CHILDS, | ) ) ) | COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| Defendant - Appellants, | ) ) | |
| REGINALD HARVEL, | ) ) | OPINION |
| Defendant. | ) ) | |

Before: SILER, CLAY, and READLER, Circuit Judges.

CLAY, J., delivered the opinion of the court in which SILER, J., concurred. READLER, J. (pp. 17–18), delivered a separate opinion concurring in the judgment.

**CLAY, Circuit Judge.** As an 18-year-old, Bernard Howard was convicted of a triple homicide after he gave a statement confessing he participated in the crime. He spent 26 years in prison before a Michigan court vacated his convictions at the request of the prosecuting office, after an investigation yielding evidence that Howard's confession was unreliable and coerced by Detroit police officers. As relevant to this appeal, Howard now brings three 42 U.S.C. § 1983 claims against Defendant Monica Childs, the detective responsible for taking his statement. He asserts that Childs fabricated his inculpatory statement, violated his Fifth Amendment rights against self-incrimination by coercing his inculpatory statement, and assisted in maliciously prosecuting him. He also asserts a § 1983 claim against Defendants Dale Collins, William Rice,

and Steven Myles, asserting that they suppressed impeaching evidence that the Detroit Police Department ("DPD") was cultivating jailhouse informants, one of whom testified that Howard and his codefendants incriminated themselves in the murders. In a well-reasoned order, the district court determined that Howard's claims should proceed to trial, denying qualified immunity to Defendants. Defendants appeal. But because Defendants fail to accept the facts of the case in the light most favorable to Howard or raise purely legal arguments challenging qualified immunity, we **DISMISS** the appeal for lack of jurisdiction.

## I. BACKGROUND

### A. Factual History

We recount the factual circumstances underlying this appeal in the light most favorable to the Plaintiff, Howard. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (when evaluating a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party).

#### 1. The 5223 Eastlawn Murders and DPD Investigation

On July 16, 1994, Marcus Averitte, Reshay Winston, and John Thornton were fatally shot at a residence, 5223 Eastlawn Street, in Detroit, Michigan. Averitte was a purported drug dealer, and the residence was a known drug house.

The DPD quickly focused on Kenneth McMullen and Ladon Salisbury as suspects in the shooting after a witness, Darmetia Bolden, identified them as being at the scene with a third man immediately prior to the murders. Howard first came to the attention of the DPD because he shared a nickname, Snoop, with a former boyfriend of Reshay Winston, who was the girlfriend of victim Marcus Averitte at the time of her death. An acquaintance of Winston's, Yolanda Jackson, reported to the DPD that Snoop had threatened to kill Averitte. But Jackson was referring to a different

Snoop, not Howard. Jackson described Snoop as a Black man, 5'6", 140 to 145 pounds, with a stocky build, thin mustache, and a fade haircut. This was consistent with Bolden's description of the third man at 5223 Eastlawn, who she stated was 5'6". Howard did not match the description: he is 6'3", weighed 140 pounds in 1994, and was wearing his hair in braids. Nevertheless, the DPD brought Howard in for questioning on July 17, 1994. Howard voluntarily came to DPD headquarters, was informed of his *Miranda* rights, gave a statement, and was released. He denied involvement in the murders, stating that he was at his friend Duck's house when the shooting took place.

On July 18, 1994, McMullen was brought to DPD headquarters for questioning, and was interrogated by Defendant Myles. From 11:45 AM on July 18 until roughly 1:00 or 1:30 AM on July 19, Myles and another officer, Carrie Russell, intermittently questioned McMullen. McMullen denied any involvement in the murders. After this initial interrogation, McMullen was moved to the ninth-floor lockup at DPD headquarters. Later on July 19, Myles interrogated McMullen a second time. This interrogation resulted in McMullen's signing a statement admitting that he intended to rob Averitte, and naming "Val"[1] and "Bernard (Snoop Dog)" as the murderers. According to McMullen, Myles fabricated the statement, which was prepared outside his presence.

Following McMullen's statement, the DPD brought Howard back to headquarters for further questioning at around 2:00 AM on July 20, 1994. Howard was initially interrogated by Myles and another detective, to whom he denied any involvement in the murders. Later that morning, he was interrogated by Defendant Childs. Eventually, Howard signed an inculpatory statement. Howard's statement details his alleged involvement in the murders, as a lookout for a

---

[1] "Val" is an apparent misspelling of "Vell," which was Ladon Lavell Salisbury's nickname.

3

robbery gone wrong. In the confession, Howard admits to standing guard for "Val" (Salisbury) and "Ken" (McMullen) while they robbed the residence at 5223 Eastlawn, and states that he saw Val shoot Marcus Averitte and Ken shoot Reshay Wilson but ran from the scene before John Thornton was shot. The confession is typed, but Howard handwrote a note stating that after the shootings, "I ran to Duck's house an [sic] went home Sunday morning 9:30 AM." 7/20/1994 Howard Stmt., R. 68-17, Page ID #1052. After signing the confession, Howard was arrested.

According to Howard, this confession was entirely fabricated. Howard testified that he signed a prewritten confession at Childs' request, after Childs presented him with McMullen's statement. After that, he complied with anything Childs asked him to do. Childs led Howard to believe that McMullen would testify against him unless he worked with the police. She also promised Howard that he could go home with his mother, who was waiting at the police station, if he signed the statement. Moreover, Howard's ability to understand the written statement Childs presented to him was limited, because he was functionally illiterate at the time, and he had been smoking marijuana and drinking alcohol prior to the interrogation. Howard testified that he attended ninth grade, but did not believe he passed. Howard also testified that he was without food or drink for the duration of his approximately ten-hour interrogation and had not slept since 6:30 AM the previous day.

### 2. The DPD Jailhouse Informant Program and Informant Testimony

The DPD obtained statements in Howard's case from two jailhouse informants, Oliver Cowan and Joe Twilley. Howard alleges that the DPD had a consistent practice, led by Defendant William Rice, head of homicide, of using jailhouse informants to fabricate confessions from homicide suspects. The stable of informants included Cowan, Twilley, Edward Allen, and Jonathan Hewitt-El. Allen and Hewitt-El were deposed in this litigation and testified that the

informants were allowed extensive jailhouse privileges in exchange for testifying falsely against homicide defendants. DPD officers would provide the informants with information, urging them to get arrestees to confess. Whether the informants got a confession or not, the officers would fabricate statements implicating the arrestees, adjusting statements to fit their needs. DPD officers instructed the informants to memorize the statements, and to testify consistently with the statements that the targets confessed.

Allen and Hewitt-El testified that the informants were "trustees," meaning they could move about the jail, allowing them the opportunity to buy and sell items like cigarettes, clothes, jewelry, and marijuana with other prisoners. The informants also had other privileges, like the opportunity to obtain food, drugs, and alcohol from family members. In addition, DPD officers facilitated conjugal visits for informants, either on the fifth floor of the DPD station or in motels. Joe Twilley had the most perks, because he had helped the DPD on so many cases. Twilley was allowed to move freely about the jail or leave the premises. Cowan was similarly situated.

Both Cowan and Twilley first gave statements in this case to the DPD on July 19, 1994, ostensibly after they encountered McMullen in the DPD's ninth-floor lockup. Cowan and Twilley alleged that McMullen confessed to committing the 5223 Eastlawn homicides, and incriminated "Val" and "Snoop" or "Snoop dog" as accomplices. Twilley gave an additional statement on July 22, 1994, after Salisbury's and Howard's arrests, stating that Salisbury had confessed to committing the murders with McMullen and Howard.

### 3. Howard's Prosecution and Conviction

After a probable cause hearing, Howard was "bound over" for trial on three counts of first-degree premeditated murder, three counts of first-degree felony murder, three counts of armed robbery, and one felony firearms offense. Howard and McMullen were tried together. There was

no eyewitness testimony or physical evidence linking Howard to the murders. Instead, the primary evidence against Howard was his alleged confession and testimony from Twilley. The prosecution introduced Howard's confession through Childs. Howard took the stand in his own defense and testified that he did not write the statement, but just signed what Childs asked him to.

Twilley testified, and said he spoke to McMullen, Salisbury, and Howard at the DPD jail. Twilley implicated all three in the murders. Howard denied talking to Twilley. Twilley initially testified that he was not incentivized to testify at the trial, though he acknowledged on cross-examination that on July 29, 1994, his sentence was reduced, and he was released from custody. He also testified to his history as a jailhouse informant for the DPD and stated that "40 or 50" people confessed crimes to him while he was jailed on the ninth floor.

Howard was convicted by a jury of the felony murder, armed robbery, and firearms charges on March 30, 1995. He was sentenced to three life sentences without the possibility of parole for the felony murder convictions, and additional sentences for the armed robbery and firearms convictions.

### 4. Vacatur

In 2020, after over 26 years of imprisonment, the Circuit Court of Wayne County vacated Howard's convictions and sentence and dismissed all charges against him. The vacatur was accomplished by stipulated order at the request of the Wayne County Prosecutor's Office ("WCPO"). The WCPO requested vacatur following an investigation of Howard's case by its Conviction Integrity Unit ("CIU"). The CIU investigation concluded that the evidence supporting Howard's conviction—Twilley's testimony and Howard's alleged confession—was unreliable. The CIU additionally found that "Howard's inclusion in the DPD homicide investigation now appears to have resulted mainly from the fact that he had a similar braided hairstyle and the same

sometimes-nickname as another braided suspect who actually had threatened to kill Marc Averitte leading up to these homicides." WCPO Press Release, R. 68-40, Page ID #2110. But the lack of eyewitness testimony or physical evidence linking Howard to the scene counseled against his involvement.

### B. Procedural History

Less than one year after the vacatur of his convictions, Howard filed a complaint against five DPD officers. Four remained as defendants at summary judgment: Collins, Rice, Myles, and Childs. Howard subsequently filed an amended complaint asserting several constitutional civil rights claims against Defendants under 42 U.S.C. § 1983. He asserted (1) *Brady* violations against Collins, Myles, Rice, and Childs in violation of the Fourteenth Amendment's due process clause; (2) federal malicious prosecution against all defendants; (3) fabrication of evidence against Childs, Collins, Myles, and Rice in violation of the Fourteenth Amendment's due process clause; and (4) violation of the Fifth Amendment right against self-incrimination against Childs. Howard abandoned his malicious prosecution claims against Collins, Myles, and Rice when responding to Defendants' motion for summary judgment. Defendants moved for summary judgment, arguing, in part, that they were entitled to qualified immunity on each of Howard's claims because Howard could not prove that any of his constitutional rights were violated. The district court denied in part and granted in part summary judgment for Defendants. As relevant to this appeal, the district court denied summary judgment as to (1) Howard's fabrication of evidence claim against Childs; (2) Howard's self-incrimination claim against Childs; (3) Howard's malicious prosecution claim against Childs; and (4) Howard's *Brady* claim against Collins, Rice, and Myles. It concluded that Defendants were not entitled to summary judgment based on qualified immunity as to each of these claims.

## II. DISCUSSION

### A. Standard of Review

We review a district court's summary judgment decision *de novo*, applying the same legal standards as the district court. *Bey v. Falk*, 946 F.3d 304, 311 (6th Cir. 2019). Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "A dispute of a material fact is genuine so long as the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020) (internal quotation marks omitted). "When evaluating a motion for summary judgment, this Court views the evidence in the light most favorable to the party opposing the motion." *Id.* (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587). "This includes drawing all justifiable inferences in the nonmoving party's favor." *Id.* (internal quotation marks omitted).

We also review *de novo* the grant or denial of qualified immunity. *Bey*, 946 F.3d at 311.

### B. Analysis

The sole issue on appeal in this case is whether Defendants are entitled to qualified immunity on Howard's constitutional claims.

In determining whether government officials are entitled to qualified immunity, this Court conducts a two-step inquiry: determining "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009) (internal quotation marks omitted). Courts have discretion to decide which prong of the analysis to address first. *Pearson v. Callahan*, 555 U.S. 223, 241–42 (2009). However, in this case, we need not consider

8

whether Howard's rights were clearly established. Defendants fail to make any argument that Howard's rights were not clearly established, and therefore, they waive any challenge to the district court's determination that Howard's rights were clearly established. *See Puckett v. Lexington-Fayette Urb. Cnty. Gov't*, 833 F.3d 590, 611 (6th Cir. 2016) (stating that, "by failing to make any developed argument in their briefing," a party waives appellate review of an issue). To the extent that they reference the clearly established prong of the qualified immunity inquiry in their brief, Defendants concede that "Howard's right not to be subjected to a coerced confession" was clearly established. Appellants' Br., ECF No. 14, 23.

In reviewing appeals of the denial of qualified immunity, our jurisdiction is limited. We have "jurisdiction to review 'a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law.'" *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 276 (6th Cir. 2020) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)). That is, on an interlocutory appeal from the denial of qualified immunity, "[w]e have jurisdiction only to the extent that the defendant limits his argument to questions of law premised on facts taken in the light most favorable to the plaintiff." *Adams v. Blount Cnty.*, 946 F.3d 940, 948 (6th Cir. 2020) (alteration adopted) (internal quotation marks omitted).

The Supreme Court made clear in *Johnson v. Jones*, 515 U.S. 304 (1995), that a defendant "may not appeal a denial of a motion for summary judgment based on qualified immunity 'insofar as that order determines whether or not the pretrial record sets forth a "genuine" issue of fact for trial.'" *Adams*, 946 F.3d at 948 (quoting *Johnson*, 515 U.S. at 320). We also "do not have jurisdiction to review a district court's determination of 'evidence sufficiency,' i.e., which facts a party may, or may not, be able to prove at trial." *Ouza*, 969 F.3d at 276 (quoting *Bunkley v. City of Detroit*, 902 F.3d 552, 559 (6th Cir. 2018)). And we "need not consider the correctness of the

9

plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim." *Mitchell*, 472 U.S. at 528.

Therefore, to contest qualified immunity, "the defendant must be prepared to overlook any factual dispute and to concede an interpretation of the facts in the light most favorable to the plaintiff's case." *Berryman v. Rieger,* 150 F.3d 561, 562 (6th Cir. 1998). If the denial of qualified immunity is based on a factual dispute, such a denial falls outside of our narrow jurisdiction. *Harrison v. Ash*, 539 F.3d 510, 517 (6th Cir. 2008).

There are two narrow exceptions to this general rule. "First, we may overlook a factual disagreement if a defendant, despite disputing a plaintiff's version of the story, is 'willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal.'" *Adams*, 946 F.3d at 948 (quoting *Barry v. O'Grady*, 895 F.3d 440, 443 (6th Cir. 2018)). "[S]econd, in exceptional circumstances, we may decide an appeal challenging the district court's factual determination if that determination is 'blatantly contradicted by the record, so that no reasonable jury could believe it.'" *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). This exception typically applies in cases like *Scott v. Harris*, 550 U.S. 372 (2007), "in which a video recording in the record 'utterly discredited' the plaintiff's narrative." *Gillispie v. Miami Twp.*, 18 F.4th 909, 916 (6th Cir. 2021) (quoting *Scott*, 550 U.S. at 380). Record evidence that merely "call[s] into question" or "cast[s] doubt" on the plaintiff's version of facts does not grant this court jurisdiction over a defendant's dispute of a district court's determination of facts. *Amerson v. Waterford Twp.*, 562 F. App'x 484, 488–89 (6th Cir. 2014).

We lack jurisdiction where neither of these exceptions applies, as in this case. We are obligated to enforce *Johnson*'s jurisdictional bar when a "defendant's qualified immunity appeal is based solely on his or her disagreement with the plaintiff's facts." *Ouza*, 969 F.3d at 277.

10

"If . . . disputed factual issues are 'crucial to' a defendant's interlocutory qualified immunity appeal," we must dismiss the appeal for lack of jurisdiction based on the defendant's disputes. *Adams*, 946 F.3d at 951 (quoting *Phelps v. Coy*, 286 F.3d 295, 298 (6th Cir. 2002)). "When determining if disputed factual issues are crucial to a defendant's appeal, we consider whether there is enough record evidence demonstrating that the district court's findings of facts and inferences are not blatantly and demonstrably false, the disputes are more than minor, and the disputes are not immaterial to the legal issues raised by the appeal." *Gillispie*, 18 F.4th at 917 (alteration adopted) (internal quotation marks omitted). If the defendant's "factual disputes are not 'crucial' to the appeal, we will 'separate an appealed order's reviewable determination (that a given set of facts violates clearly established law) from its unreviewable determination (that an issue of fact is "genuine").'" *Id.* (quoting *Adams*, 946 F.3d at 948).

Because the district court opinion in this case was well reasoned and supported by the record, we only briefly discuss Defendants' challenges to the district court's denial of qualified immunity as to each of Howard's remaining civil rights claims. *See id.* The district court applied the correct summary judgment standard, reviewing the record evidence and making inferences in favor of Howard, the non-moving party, to decide that Howard had raised triable issues of fact on his fabrication of evidence, self-incrimination, malicious prosecution, and *Brady* claims. Defendants challenge only the factual bases for the district court's determinations, and therefore, we lack jurisdiction over their appeal. Additionally, Defendants have waived any challenge to the district court's determination that Childs was not entitled to qualified immunity on Howard's malicious prosecution claim.

First, Defendants argue that Childs is entitled to qualified immunity on Howard's fabrication of evidence claim. On this claim, the district court determined that "Howard has raised

11

a triable issue of fact as to whether his confession was . . . procured by coercion," and therefore "a genuine dispute remains as to whether Childs's extraction of that confession amounted to a fabrication of evidence." Op. & Order, R. 96, Page ID #4935. Defendants attack this determination by disputing facts, which is fatal to their appeal. They acknowledge that whether Howard's confession is coerced is a matter of fact. But they argue that "Howard's claim of a coerced and manufactured confession is blatantly contradicted by the record," attempting to avail themselves of our jurisdiction through the exception established by *Scott v. Harris*. Appellants' Br., ECF No. 14, 24. Yet Defendants have presented no evidence to utterly discredit Howard's narrative that he signed a fabricated statement under coercion.

Defendants chiefly rely upon an email purportedly sent from an investigator interested in Howard's case, Claudia Whitman, who relayed to a third party that Howard said "the only reason I was able to make a statement was because monica childs showed me a confession from kenneth mcmullen implicating me in this crime I got so afraid I tried to imitate what mcmullen said." Whitman Emails, R. 68-44, Page ID #2136. Defendants use this email to argue that Howard's confession was his own statement, and therefore the statement could not have been coerced or fabricated by Childs. But contrary to Defendants' argument, this message does not uncontrovertibly prove that Howard wrote the incriminating statement of his own free will. As an initial matter, this email did not come directly from Howard. Nevertheless, Howard testified that he was not admitting to Whitman that he provided Childs with a statement, but was indicating that "he knew about the facts of the crime," or "kn[e]w what [was] going on" from McMullen's statement, and that McMullen's statement was his impetus for complying with Childs to save himself. Howard Dep. R. 68-3 Page ID #808–09, 818. The email can be interpreted consistently with Howard's testimony, that he tried to cooperate with Childs but still signed a fabricated

confession as to his involvement with the crime, rather than supporting Defendants' chosen interpretation that Howard wrote the statement himself. This is additionally consistent with Howard's longstanding narrative that Childs used McMullen's statement to convince Howard to incriminate himself.

Even if Howard provided Childs with oral statements imitating what McMullen said, that does not prevent a jury from finding that his confession was fabricated: Defendants do not dispute that Childs typed Howard's statement, and a jury could find fabricated elements in what she typed. *See Sanford v. City of Detroit*, 815 F. App'x 856, 859 (6th Cir. 2020) (upholding denial of qualified immunity of fabrication-of-evidence claim when "evidence would allow a jury to find that" officer drafted a false confession and attributed it to the plaintiff).

In any event, where Howard has consistently reported that Childs coerced him to sign a prewritten statement, even Defendants' interpretation of the Whitman email, at most, casts doubt on Howard's version of the facts. This does not afford us jurisdiction over Defendants' appeal. Rather, it demonstrates that a genuine dispute of material fact exists as to whether Howard's confession was fabricated, consistent with the district court's determination. Accordingly, we lack jurisdiction over Defendants' challenge to the denial of Childs' qualified immunity on Howard's fabrication of evidence claim. *See Gregory v. City of Louisville,* 444 F.3d 725, 744–45 (6th Cir. 2006) (citing *Johnson*, 515 U.S. at 313); *Moldowan v. City of Warren*, 578 F.3d 351, 397 (6th Cir. 2009) ("Because [defendant] challenges the factual allegations that he fabricated and manipulated evidence, however, we lack jurisdiction to consider [defendant's] appeal from the denial of summary judgment.").

Second, Defendants argue that Childs is entitled to qualified immunity on Howard's self-incrimination claim. The district court determined that Howard "produced evidence sufficient to

raise an issue of material fact as to whether his confession was coerced" and therefore involuntary, allowing him to proceed to trial on his self-incrimination claim. Op. & Order, R. 96, Page ID #4930–34. Defendants challenge this determination by arguing that Howard's evidence does not constitute involuntariness. But rather than rely on legal arguments to mount this challenge, Defendants challenge the central factual premises that Howard's confession was coerced, and that Howard was functionally illiterate such that he could not understand what he was signing. Yet the district court's determinations that Howard's confession was coercively obtained through illusory promise, and that Howard's illiteracy impacted his ability to understand the ramifications of the confession he was signing, were crucial to its determination that a totality of circumstances indicated Howard's confession was involuntary. These disputes are material, *see Gillipsie* 18 F.4th at 917, and Defendants accordingly cannot obtain jurisdiction over their appeal by challenging the central factual premises of the district court's thorough opinion.

Third, Defendants argue that Collins, Rice, and Myles are entitled to qualified immunity on Howard's *Brady* claim, challenging the district court's contrary determination. Howard's *Brady* claim against Defendants is premised on the theory that Defendants failed to disclose evidence of the "snitch witness program" they used to cultivate fabricated jailhouse informant testimony, including Twilley's testimony at Howard's trial. Op. & Order, R. 96, Page ID #4938 (internal quotation marks omitted). The district court concluded that Howard had established a genuine issue of material fact as to this *Brady* claim, meaning his Fourteenth Amendment due process rights were violated. Specifically, the court concluded that Howard had raised a fact issue as to whether "Rice, Collins, and Myles were aware of or participated in a practice of providing benefits or preferential treatment to inmates in exchange for false or fabricated testimony in pending criminal cases." *Id.* at Page ID #4940. There was a further genuine dispute of material fact as to whether

14

the suppression of this evidence prejudiced Howard. The district court concluded that the introduction of the evidence "would have undercut the credibility of testimony of [] Childs, Myles, and Rice," at Howard's trial, further impeached Twilley, and therefore could cast so much doubt on the evidence against Howard as to undermine confidence in the guilty verdict. *Id.* at Page ID #4940–42.

Defendants do not challenge the favorability of the alleged snitch-witness evidence nor the assertion that the evidence was suppressed. They challenge only the district court's prejudice determination. Like Defendants' other challenges to the district court's denial of qualified immunity, we lack jurisdiction over this challenge because it "involves disputed issues of fact which are beyond our reach at this juncture." *Moldowan*, 578 F.3d at 389. We have previously stated that the issue of whether a plaintiff "cannot prevail on his *Brady* claims because he cannot demonstrate prejudice" is a fact-bound one. *Id.* So, because Defendants only challenge the district court's denial of qualified immunity on Howard's *Brady* claim to argue the jailhouse informant evidence was not prejudicial, we lack jurisdiction over Defendants' appeal.

In their opening brief, Defendants state, in a heading, that "Childs Is Entitled To Qualified Immunity As To . . . Howard's Claim[] of . . . Malicious Prosecution." Appellants' Br., ECF No. 14, 23. Howard contends that Defendants have waived any argument challenging the district court's denial of qualified immunity on the malicious prosecution claim against Childs because they failed to properly address the issue in their brief. We agree. "The failure to present an argument in an appellate brief waives appellate review." *Puckett*, 833 F.3d at 611 (internal quotation marks omitted). And "addressing an issue on appeal 'requires developed argument; a party is required to do more than advert to an issue in a perfunctory manner.'" *Id.* (quoting *Bolden v. City of Euclid*, 595 F. App'x 464, 468 (6th Cir. 2014)). Though they nominally raise the issue,

Defendants fail to present any developed, specific argument as to why Childs is entitled to qualified immunity on Howard's malicious prosecution claim. The only particular discussion of malicious prosecution concerns a brief reference to the legal standard, which Defendants assert as "[a] defendant can be held liable for malicious prosecution where the fabricated evidence was material to the probable cause determination." Appellants' Br., ECF No. 14, 32–33. But Defendants fail to discuss probable cause. This does not constitute a developed argument, and therefore, the issue is waived on appeal. *Cf. Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 625 (6th Cir. 2013) ("By failing to raise any specific challenges to the district court's decision . . . Kuhn has waived those challenges.").

### III. CONCLUSION

For the reasons set forth above, this Court **DISMISSES** Defendants' appeal for lack of jurisdiction.

CHAD A. READLER, Circuit Judge, concurring in judgment. In this § 1983 appeal, four police officers challenge the district court's summary judgment order denying their request for qualified immunity. I agree that defendants are not entitled to qualified immunity. But I would not dispose of their appeal on jurisdictional grounds. Like virtually every defendant in this posture, defendants here quarrel at times with the district court's reading of the record. That is to be expected, given the nature of our adversarial system. *See, e.g.*, *Coffey v. Carroll*, 933 F.3d 577, 583–84 (6th Cir. 2019); *Sevy v. Barach*, 815 F. App'x 58, 67 (6th Cir. 2020) (Readler, J., concurring in part and in the judgment) ("[I]n cases where there are genuine disputes over material facts, we do not dismiss the appeal on jurisdictional grounds merely because the defendant made some factual arguments or used aspects of her own factual account in mounting a legal argument for qualified immunity."). It is equally routine for us to ignore those factual arguments and, accepting the facts in plaintiff's favor, tackle any legal issues raised by defendants.

Today's case fits the bill. Defendants raise several "neat abstract issues of law" over which we have jurisdiction. *Johnson v. Jones*, 515 U.S. 304, 317 (1995) (citation omitted). But in the end, none are meritorious. Reading the record in Bernard Howard's favor, officer Monica Childs knowingly pre-drafted a false confession, coerced Howard to sign it by promising that he could leave the interrogation and go home with his mom if he confessed, and provided the confession to his prosecutor, who in turn used it to bind Howard for trial and to convict him at trial. In addition, says Howard, officers Dale Collins, William Rice, and Steven Myles failed to disclose to the prosecutor before trial that they (and other police officers) provided jailhouse informants, including the one who testified at Howard's trial, various benefits in exchange for testimony.

From that record, a reasonable jury could find that Childs fabricated and coerced Howard's confession and maliciously prosecuted him, all in violation of clearly established Fourth and Fifth

Amendment principles. *See Jackson v. City of Cleveland*, 925 F.3d 793, 814–16 (6th Cir. 2019); *United States v. Wrice*, 954 F.2d 406, 411 (6th Cir. 1992); *Monson v. City of Detroit*, No. 22-2050, 2024 WL 84093, at *7–8, (6th Cir. Jan. 8, 2024); *Sanford v. City of Detroit*, 815 F. App'x 856, 859 (6th Cir. 2020); *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010). Howard's state law malicious prosecution claim survives summary judgment for similar reasons. *See Matthews v. Blue Cross & Blue Shield of Mich.*, 572 N.W.2d 603, 609–10 (Mich. 1998). Likewise, under existing circuit precedent, a reasonable jury could find that Collins, Rice, and Myles violated clearly established *Brady* principles. *See Moldowan v. City of Warren*, 578 F.3d 351, 378–82 (6th Cir. 2009).

It is worth mentioning that defendants will have the opportunity to present their version of the events to a jury. But because we must construe the record evidence in the light most favorable to Howard at this stage, they are not entitled to qualified immunity. On that basis, I concur in today's judgment.